**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**PHYSICIANS GUARDIAN UNIT INVESTMENT TRUST, by and through its Trustee, PHYSICIANS GUARDIAN, INC.; Physicians Guardian, Inc.; Physicians Guardian Insurance Corp.; ABFAC, Inc.; Tel Com Plus East, L.L.C.; Tel Com Plus West, L.L.C.; Charles Polley; and Robert W. Singerman, Defendants.**

No. 99–1117–CIV–T–17A.

United States District Court, M.D. Florida.

Oct. 29, 1999.

Gwynne Alice Young, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, for Gwynne A. Young.

Glenn A. Harris, Chedley C. Dumornay, J. Cindy Eson, Securities & Exchange Commission, Miami, FL, for Securities & Exchange Commission.

William C. Guerrant, Jr., Hill, Ward & Henderson, P.A., Tampa, FL, for Tel Com Plus East, L.L.C., Tel Com Plus West, L.L.C.

Burton Webb Wiand, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, FL, for Charles Polley.

John Robert Kiefner, Jr., Riden, Earle & Kiefner, P.A., St. Petersburg, FL, for Robert W. Singerman.

### ORDER ON MOTION TO DISMISS PLAINTIFF'S COMPLAINT

KOVACHEVICH, Chief Judge.

This cause comes before the Court on:

Dkt. 47 Motion to Dismiss

Dkt. 52 Response

### STANDARD OF REVIEW

■ A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that a complainant can prove no set of facts that support a claim for relief. *Anderson v. Transglobe Energy Corp.*, 35 F.Supp.2d 1363, 1365 (M.D.Fla.1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In ruling on a motion to dismiss, a trial court is required to view the complaint in the light most favorable to the plaintiff. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2nd Cir.1989). The allegations in the complaint should be taken as admitted by the defendant and liberally construed in favor of the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969).

■ Federal Rule of Civil Procedure 8(a)(2) instructs that a pleading need only "contain a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The Eleventh Circuit has liberally construed Rule 8(a)(2) of the Federal Rules of Civil Procedure to mean "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the

claim being asserted against him and the grounds on which it rests." *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 964 n. 2 (11th Cir.1997) (quoting *Sams v. United Food & Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir.1989)). Under the standards set forth, the Court turns to consideration of the claim at hand.

### BACKGROUND

The Securities and Exchange Commission brought this action on May 12, 1999 requesting emergency relief to stop an ongoing fraudulent offering involving several defendants, including Defendant, Charles Polley. (Dkt.1). Plaintiff's Complaint sets forth eight counts. Count I of the complaint addresses the sale of unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act against Defendants Tel Com Plus East, L.L.C., Tel Com Plus West, L.L.C., and Defendant Polley; Count II is for the sale of unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act against Defendants Physicians Guardian Unit Investment Trust, Physicians Guardian, Inc., Physicians Guardian Insurance Corp., AB-FAC, Inc., Charles Polley, and Robert W. Singerman; Count III is for fraud in violation of Section 17(a)(1) of the Securities Act against Defendants Tel Com Plus and Charles Polley; Count IV is for fraud in violation of 17(a)(1) of the Securities Act against Defendants Physicians Guardians Unit Investment Trust, Physicians Guardian, Inc., Physicians Guardian Insurance Corp., ABFAC, Inc., Charles Polley, and Robert W. Singerman; Count V is for fraud in violation of Section 10(b) of the Exchange Act and Rule 10b–5 against Defendants Tel Com Plus and Charles Polley; Count VI is for fraud in violation of 10(b) of the Exchange Act and Rule 10b–5 against Defendants Physicians Guardians Unit Investment Trust, Physicians Guardian, Inc., Physicians Guardian Insurance Corp., ABFAC, Inc., Charles Polley, and Robert W. Singerman; Count VII is for fraud in violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act against Defendants Tel Com Plus and Charles Polley, and Count VIII is for fraud in violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act against Defendants Physicians Guardians Unit Investment Trust, Physicians Guardian, Inc., Physicians Guardian Insurance Corp., ABFAC, Inc., Charles Polley, and Robert W. Singerman.

On July 9, 1999, Defendant Polley filed a motion to dismiss Plaintiff's complaint, alleging that the "Complaint fails to set forth sufficient facts or allegations against Defendant Polley with respect to the fraud based counts", Counts III–VIII within the Complaint. (Dkt.47). In response to Defendant Polley's motion, Plaintiff contends that the Commission's Complaint "without question, satisfies the requirements of Rule 9(b)" by containing detailed factual allegations and specific documents referencing dates and places concerning the fraud perpetrated by Defendant Polley. (Dkt.52).

Plaintiff's Complaint, pertaining to Defendant Polley, alleges the following:

1. Through a network of "boiler rooms" in Florida and California that utilize high-pressure telemarketing sales tactics, Defendants are fraudulently offering and selling unregistered securities in the form of "units" in the Physicians Guardian Unit Investment Trust to unsophisticated investors. (Dkt. 1, Paragraph 1).

2. While Defendants represent to prospects and investors that the funds invested in the Physicians Guardian Unit Investment Trust will be used to purchase an interest in an offshore medical malpractice insurance company, in reality there is no business and Defendants really intend to keep 60% of the money raised as commissions, costs, and fees. (Dkt. 1, Paragraph 2).

3. Upon information and relief, Defendants have raised more than $4 million from the investors so far. (Dkt. 1, Paragraph 2).

4. The Physicians Guardian, Inc. offering is the second unregistered, fraudulent offering devised and orchestrated by Defendant Polley. (Dkt. 1, Paragraph 3).

5. Before launching Physicians Guardian, Inc., Defendant Polley, offered and sold a similarly-structured investment in two related "pre-paid telephone companies" named Tel Com Plus East, L.L.C. and Tel Com Plus West, L.L.C.. (Dkt. 1, Paragraph 3).

6. From September 1997 to October 1998, at least $14.6 million was raised from investors through the Tel Com Plus offering. While Tel Com Plus has closed, the Physicians Guardian, Inc. offering is ongoing. (Dkt. 1, Paragraph 3).

7. Tel Com Plus offered for sale 22,000 units at prices ranging from approximately $7,500 to $9,500 per unit. As with Physicians Guardian, Inc., the Tel Com Plus offering was offered and sold through a network of telemarketing organizations in Florida and California. The telemarketers "cold-called" prospective investors and used "boiler-room" sales techniques in their solicitation of investors. (Dkt. 1, Paragraph 44).

8. Like Physicians Guardian, Inc., investors in Tel Com Plus received a package of offering materials consisting of a color sales brochure, an offering memorandum, and other documents. No registration statement was filed with the Commission in connection with the Tel Com Plus offering. (Dkt. 1, Paragraph 44).

9. Defendant Physicians Guardian Unit Investment Trust purports to be an "unit investment trust." (Dkt. 1, Paragraph 4).

10. Defendant Physicians Guardian, Inc. was incorporated in Florida in April 1998 and maintains its principal offices at 13902 N. Dale Mabry, Suites 212 and 214, Tampa, Florida 33618. (Dkt. 1, Paragraph 5).

11. Physicians Guardian, Inc. is the issuer of the unregistered Physicians Guardian Unit Investment Trust "units" described herein and the trustee of the Physicians Guardian Unit Investment Trust. (Dkt. 1, Paragraph 5).

12. Defendant Physicians Guardian Insurance Corp. ("Physicians Guardian") purports to be a medical malpractice insurance company licensed and domiciled in the Cayman Islands. Physicians Guardian maintains offices at 13902 Dale Mabry, Suite 214, Tampa, Florida 33618. (Dkt. 1, Paragraph 6).

13. Defendant ABFAC, Inc. was incorporated in Florida in October 1998 and maintains its principal offices at 13902 N. Dale Mabry, Suite 212, Tampa, Florida 33618. (Dkt. 1, Paragraph 7).

14. ABFAC, Inc. serves as the administrative arm of Physicians Guardian, Inc. and is responsible for taking in investor funds and processing paperwork. (Dkt. 1, Paragraph 7).

15. Defendant Tel Com Plus East, L.L.C. was organized in April 1997 and maintained its principal offices at 13902 N. Dale Mabry, Suite 149, Tampa, Florida 33618. It purports to be a telephone company that provides prepaid local and long distance telephone service to the credit-impaired in the region east of the Mississippi. (Dkt. 1, Paragraph 8).

16. Defendant Tel Com Plus West, L.L.C. was organized in July 1997 and maintained its principal offices at 13902 N. Dale Mabry, Suite 149, Tampa, Florida 33618. It purports to be a telephone company that provides prepaid local and long distance telephone service to the credit-impaired in the region west of the Mississippi. (Dkt. 1, Paragraph 9).

17. Defendant Polley is described to investors as the "CEO of Physicians Guardian." Defendant Polley was also the chairman of the entity that served as a "co-managing member" of Tel Com Plus. Defendant Polley resides in Tampa, Florida. (Dkt. 1, Paragraph 10).

18. From at least October 1998 and continuing to the present, Defendants have been offering and selling the general public unregistered securities in the form of "units" in the Physicians Guardian Unit Investment Trust. (Dkt. 1, Paragraph 15).

19. Defendants are offering the units for sale for $22,000 per unit for a total offering of approximately $8 million. Investors are told that the funds from the offering will be used to purchase a 40% interest in Physicians Guardian, Inc. (Dkt. 1, Paragraph 15).

20. The Physicians Guardian Unit Investment Trust units are securities as defined by Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(10). No registration statement was filed or is in effect pursuant to the Securities Act in connection with these offers and sales. (Dkt. 1, Paragraph 16).

21. The telemarketers use high-pressure sales techniques when soliciting investors and "cold-call" prospects throughout the country. If a prospective investor expresses interest in the offering and has funds immediately available, the telemarketer sends the prospect a package of Physicians Guardian, Inc. offering materials by overnight delivery. (Dkt. 1, Paragraph 17).

22. The telemarketer later calls to make sure the prospect has received the offering materials, to answer any questions or address any objections the prospect might have and finally, to solicit the investment. The sales techniques are designed to create a sense of urgency in the investor. (Dkt. 1, Paragraph 18).

23. Once prospects are persuaded to invest, the telemarketers tell the prospects to sign the documents included in the offering materials and send them, along with their funds, to Physicians Guardian, Inc.'s administrative arm, ABFAC, Inc. (Dkt. 1, Paragraph 18).

24. Prospects are also encouraged to invest savings, including funds in Individual Retirement Accounts and pension savings plans. No registration statement has been filed with the Commission in connection with the Physicians Guardian, Inc. offering. (Dkt. 1, Paragraph 19).

25. In addition, the boiler rooms have never been registered with the Commission as broker-dealers during the relevant period. (Dkt. 1, Paragraph 19).

26. Prospective investors receive a package of offering materials describing the Physicians Guardian investment. The offering materials include a high-quality color sales brochure, a "confidential private offering memorandum," and a set of subscription documents. Prospects also receive payment instructions, a pre-addressed FedEx shipping label, a newsletter, and corporate updates. Prospects are also encouraged to visit the Physicians Guardian Web. (Dkt. 1, Paragraph 20).

27. Physician Guardian bills itself as an insurance company owned and operated by doctors, for doctors. In the brochure, investors are told that Physicians Guardian will offer the "highest quality liability coverage to U.S. physicians, at rates up to 20% below their current annual

premiums." The company claims it will be able to offer these discounts because it will target only those doctors with a history of practicing "good medicine." All applicants will purportedly be screened by a medical advisory board of up to nine "eminent physicians, who are also directors of the company." Information gathered by the medical advisory board will purportedly be sent to the company's reinsurer, "whose industry experts pass the final judgment on each applicant." (Dkt. 1, Paragraph 21).

28. Physicians Guardian also boasts that it has engaged a group of first-rate "Professional Advisors" who will ensure that the company manages risks successfully. In addition, three full pages of the brochure are dedicated to highlighting the credentials of Physicians Guardian, Inc. and Physicians Guardian Insurance Corp.'s key personnel. (Dkt. 1, Paragraph 22).

29. The offering materials also include a 29–page "confidential private offering memorandum," which contains a section discussing the use of proceeds. The use of proceeds section indicates that 40%, or $3.2 million of the $8 million, to be raised from investors will be used to purchase a stake in Physicians Guardian. (Dkt. 1, Paragraph 23).

30. It appears from the use of proceeds section that the remaining 60% of the offering proceeds will go towards a dozen other ill-defined items, such as "Business Development," "Licenses and Permits," "Production Costs," "Administrative and Business Expense," "Market Consultation," "Market Analysis," and "Management Fee." If read painstakingly, this ambiguous section indicates that 60% of investor funds will be used to pay commissions, fees and costs associated with the offering. (Dkt. 1, Paragraph 24).

31. The Physicians Guardian offering materials contain material misrepresentations and omissions concerning, among other things, the engagement of the company's "Professional Advisors," a contract and business alliance with an established insurance carrier, its financial projections, the use of investor proceeds, its authority to transact business in various states, and the background and experience of Physicians Guardian, Inc.'s and Physician Guardian's principals. (Dkt. 1, Paragraph 25).

32. The Physicians Guardian sales brochure contains a two-page spread touting Physicians Guardian's engagement of a team of "Professional Advisors," which includes, among others, auditors KPMG Peat Marwick ("KPMG"), reinsurance broker Intere Intermediaries, Inc. ("Intere"), and actuaries Milliman & Robertson. (Dkt. 1, Paragraph 26).

33. Investors are told, for example, that KPMG provides audit services to over 30% of the captive insurance companies licensed in the Cayman Islands and that it is the only accounting firm in the Cayman Islands with a resident U.S. tax department, which allows it "to provide integrated, multi-disciplinary advise and services to a company like Physicians Guardian." (Dkt. 1, Paragraph 27).

34. Investors are also told that Intere is an "international reinsurance broker" whose depth of experience assures that Physicians Guardian "will at all times enjoy the most competitive rates from its principle insurers." (Dkt. 1, Paragraph 28).

35. Milliman & Robertson is described as being "among the largest actuarial and management consulting firms in the U.S.," and having "extensive experience re-

lating to captive insurance companies throughout the world ..." During telephone solicitations, the telemarketers emphasize that Physicians Guardian is under the stewardship of these "Professional Advisors," virtually assuring the company's success. (Dkt. 1, Paragraph 29).

36. The representations regarding the company's engagement of these "Professional Advisors" are false and misleading because Physicians Guardian has not, in fact, retained any of these advisors or established any business relationship with them. In reality, neither KPMG nor Milliman & Robertson has ever had any dealings with Physicians Guardian, Inc. of Physicians Guardian. Further, Intere has been defunct since 1995. (Dkt. 1, Paragraph 30).

37. A memorandum sent to prospects also states that Physicians Guardian has entered into a contract to "piggy-back" onto an established insurance company's existing network, purportedly allowing Physicians Guardian to use the established insurance company's licenses to issue policies in individual states. The contract is described as a "major coup." (Dkt. 1, Paragraph 31).

38. Investors are also told that this "new partner" was so impressed with its operations that meetings were underway to "expand upon the already signed contract and work out an even deeper involvement and alliance between both companies." Investors are also assured that the new business partner "will be actively engaged in supporting [Physicians Guardian] to fulfill [its] projections as well as significantly outperforming them." Investors are told that the new partner has been confirmed as either "Fireman's Fund, All State or Farmer's Insurance." (Dkt. 1, Paragraph 31).

39. Physicians Guardian, Inc.'s representations to investors about its "new business partner" are blatantly false. Allstate Insurance Company, the Farmers Insurance Group of Companies, and Fireman's Fund Insurance Company confirmed that they have never entered into any contracts or alliances with Physicians Guardian. Although Fireman's Fund Insurance Company indicated that it had been contacted by a consultant representing Physicians Guardian inquiring about a fronting carrier agreement, there discussions were preliminary and non-substantive. (Dkt. 1, Paragraph 32).

40. The offering package includes a five-year financial summary in which Physicians Guardian projects it will enroll 800 doctors in its insurance program in its first year of operations and take in $20 million in annual premiums. By its fifth year of operation, Physicians Guardian projects it will take in $100 million in annual premiums and have an enrollment of 4,000 doctors. (Dkt. 1, Paragraph 33).

41. The financial summary states that investors can expect to earn a 22% annual return on their investment in the first year, 45% the second year, 69% the third year, 93% the fourth year, and 119% the fifth year. The telemarketers tell investors that these exorbitant returns are "conservative." (Dkt. 1, Paragraph 34).

42. Investors are also told that in addition to these returns, their units will appreciate in value because each year the company will have built up its cash holdings and excess reserve pool. (Dkt. 1, Paragraph 34).

43. The offering materials and telephone solicitations make clear that the company's success is based

upon involvement of the company's "Professional Advisors" and the contract and alliance with either Fireman's Fund, Allstate or Farmers Insurance, its purported new business partner. These financial projections and anticipated returns, however, are false and misleading because they are predicated on the non-existent relationships with the much-touted "Professional Advisors" and a non-existent contract and business alliance with an established insurance company. (Dkt. 1, Paragraph 35).

44. Given that the "Professional Advisors" have no involvement whatsoever with Physicians Guardian and that the company has no contract or business alliance with Fireman's Fund, Allstate or Farmers Insurance, there is no reasonable basis for the financial projections. (Dkt. 1, Paragraph 35).

45. The offering materials and telemarketers also lead prospects to believe that Physicians Guardian is authorized to transact insurance business in several states, and that it is already accepting applications from doctors. Specifically, investors are being told that Physicians Guardian is licensed to operate as an insurance company in Florida, Georgia, and California. (Dkt. 1, Paragraph 36).

46. Prospects are also told that the company has already entered into an agreement with a "pre-paid medical network in Atlanta, Georgia numbering 650 physicians" to offer malpractice coverage as part of its benefit package for members. Investors are also told that 80 to 250 doctors from an independent physicians association are going to be signed up. They are also told that 300 doctors have already applied for coverage with Physicians Guardian. In truth, Physicians Guardian is not licensed or authorized to transact insurance business in Florida, Georgia, or California. (Dkt. 1, Paragraph 36).

47. The Physicians Guardian, Inc. offering materials also contain false and misleading information about Physicians Guardian's and Physicians Guardian, Inc.'s personnel. For example, Howard W. Kratz is described as a "recognized leader in the development of computerized management systems for physicians and medical clinics" who brings "extensive computer systems experience to the company." The offering materials fail to disclose, however, that Howard Kratz has been the subject of two cease-and-desist orders in connection with the prior Tel Com Plus offering. (Dkt. 1, Paragraph 37).

48. The offering materials also profile Richard M. Owers as being an attorney with "over 27 years experience in personal injury law, with successful representation of over 35,000 personal injury cases." Investors are told that he brings "an invaluable legal perspective to Physicians Guardian." Richard Owers is represented to have received his law degree from the Boston University School of Law in Boston, Massachusetts. In fact, Richard Owers never graduated from or even attended the Boston University School of Law. (Dkt. 1, Paragraph 38).

49. The offering materials also profile Lynn Murphy. (Dkt. 1, Paragraph 39). Lynn Murphy is said to bring "global perspective of the insurance industry" to Physicians Guardian, Inc. having been "actively involved in the development of captive insurance companies since 1988." (Dkt. 1, Paragraph 39). The materials state that Lynn Murphy currently holds a life and health insurance license from North Carolina. This information is false as Lynn Mur-

phy's license was canceled more than three years ago. (Dkt. 1, Paragraph 39).

50. Telemarketers orally tout Defendant Polley's background to prospective investors. At least one prospective investor was told that Defendant Polley is a former vice president of Oppenheimer Funds. The representations being made to prospects about Defendant Polley are materially false and misleading and omit material facts. In fact, Defendant Polley was never employed by Oppenheimer Funds in any capacity and has been the subject of at least three state cease-and desist orders in connection with the prior Tel Com Plus offering. (Dkt. 1, Paragraph 40).

51. While soliciting investors, the telemarketers frequently refer to Defendant Polley as the person with key information about Physician Guardian's operations, such as the number of doctors enrolled in the program and where it is licensed to sell insurance. Defendant Polley also participated in the creation of the Physicians Guardian, Inc. offering materials. (Dkt. 1, Paragraph 41).

52. The Tel Com Plus offering materials contained material misrepresentations and omissions concerning the background and experience of its principals and the use of investor proceeds. (Dkt. 1, Paragraph 44).

53. The Tel Com Plus offering materials lead investors to believe that most of their funds would be used to operate and expand the business nationwide and that no more than 3 1/2% of the total cash capitalization would be used for fees and expenses. The offering materials failed to disclose, however, that more than 40% of the funds raised from investors were used to pay sales commissions to the network of boiler rooms that participated in the offering. (Dkt. 1, Paragraph 46).

54. The Tel Com Plus offering materials contained profiles of company's "key personnel." For example, investors were told that Defendant Polley was a Wharton graduate and a former "National Vice President of Oppenheimer." In fact, Defendant Polley never graduated from or even attended Wharton. Nor was he ever employed in any capacity by Oppenheimer Funds of Oppenheimer & Co. as investors were made to believe. Rather, Defendant Polley was employed by Oppenheimer Industries, Inc., a cattle company in Kansas City, Missouri. (Dkt. 1, Paragraph 47).

55. The offering materials also profiled Joseph P. Cillo, who was described as a "legal consultant" and director. Investors were told that Joseph Cillo "serves Tel Com Plus in the areas of compliance, mergers and acquisitions and planning for an initial public registration." The offering materials failed to disclose, however, the Joseph Cillo is a recidivist securities law violator, who was also forced to resign from the Florida Bar in lieu of discipline. (Dkt. 1, Paragraph 48).

56. William Van Aken is also listed among the "Key Personnel" in the Tel Com Plus offering materials. William Van Aken is described as a graduate of the University of Iowa, who "began his telecommunications career with GTE Mobilnet in 1992," and in 1994, "became the overall manager of GTE's largest agent network in Florida. . . ." In fact, William Van Aken never graduated from the University of Iowa and was never employed by GTE Mobilnet. (Dkt. 1, Paragraph 49).

57. The Tel Com Plus materials also failed to disclose that numerous

states had issued cease-and-desist orders against, among others, Tel Com Plus and Defendant Polley for violations of the registration and antifraud provisions of their respective state securities laws. (Dkt. 1, Paragraph 50).

58. From late January to early October 1998, during the period when investors were actively solicited, five states issued cease-and-desist orders against Tel Com Plus and its principals for fraud and selling unregistered securities. The Tel Com Plus offering materials were never revised or supplemented to inform prospective investors about the cease-and-desist orders, even though the materials were frequently updated with new information about Tel Com Plus. Nor did the telemarketers disclose to prospects that cease-and-desist orders had been issued. (Dkt. 1, Paragraph 50).

59. Defendant Polley was chairman of the entity that was "co-managing member" of Tel Com Plus. His background and experience were profiled in the Tel Com Plus sales brochure. Defendant Polley coordinated the sales efforts of the telemarketers and provided them with sales brochures and other materials about the Tel Com Plus offering. He also recruited telemarketers to sell the offering. Defendant Polley spoke directly with at least one prospect and encouraged him to invest in Tel Com Plus. He also communicated with prospects and investors in writing through various memoranda regarding the progress of Tel Com Plus. Further, Defendant Polley signed the Tel Com Plus operating agreement included in the offering. (Dkt. 1, Paragraph 51).

## DISCUSSION

On July 9, 1999, Defendant Polley filed a motion to dismiss Plaintiff's complaint alleging that the "Complaint fails to set forth sufficient facts or allegations against Defendant Polley with respect to the fraud based counts", Counts III–VIII within the Complaint. (Dkt. 47, Paragraph 4). Defendant Polley asserts that Plaintiff offers scant evidence of the acts and transactions evidencing fraudulent conduct on the part of Defendant Polley with respect to the Tel Com Plus offering. (Dkt. 47, Paragraph 7). In addition, Defendant Polley asserts that Plaintiff offers no evidence of any kind that supports the contention that Defendant Polley was affiliated in any way with Physicians Guardian other than in the preparation of their brochure, "let alone that Defendant Polley was otherwise engaged in fraudulent conduct with respect to the Physicians Guardian offering." (Dkt. 47, Paragraph 8). In essence, Defendant Polley asserts that Plaintiff has failed to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, with regard to the heightened federal pleading standard. (Dkt. 47, Paragraph 9).

In response to Defendant Polley's motion, Plaintiff contends that the Commission's Complaint "without question, satisfies the requirements of Rule 9(b)" by containing detailed factual allegations and specific documents referencing dates and places concerning the fraud perpetrated by Defendant Polley. (Dkt.52). Additionally, Plaintiff contends that the Complaint satisfies the requirements of Rule 9(b) based on the detailed facts concerning Defendant Polley's illicit fraudulent securities schemes that were provided in the Complaint, as well as, within several hundred pages of exhibits, FBI transcripts of "boiler room" calls to elderly investors, and other documents filed in conjunction with the Complaint. (Dkt.52). Furthermore, Plaintiff asserts that the Complaint provides the necessary detail to give adequate notice to Defendant Polley to enable him to prepare an adverse pleading. (Dkt.52).

## I. Rule 9(b) of the Federal Rules of Civil Procedure Requires that Allegations of Fraud be Plead with Particularity

■ Rule 9(b) of the Federal Rules of Civil Procedure requires allegations involving fraud to be pled with specificity and particularity. FedR.Civ.P. 9(b). However, when considering the question of whether or not a pleading of fraud is alleged with adequate particularity in a securities law context, this Court must not read Rule 9(b) of the Federal Rules of Civil Procedure to abrogate the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. *Friedlander v. Nims*, 755 F.2d 810 (11th Cir. 1985). Therefore, the Court, in considering a motion to dismiss for failure to plead fraud with particularity, must be careful to harmonize the directives of Fed.R.Civ.P. Rule 9(b) with the broader policy of notice pleading. *See id.* at 810.

■ In the pleading before the Court, Plaintiff has stated circumstances in which Defendant Polley has disseminated or conveyed material information regarding the Tel Com offering and/or the Physicians Guardian offering to prospective clients. (Dkt.1) These offerings, as alleged by Plaintiff, grossly understated the percentage of investor funds that would go into non-producing expenses, greatly overstated the background and qualifications of the individuals running the enterprises, and greatly omitted material facts. (Dkt.1) Plaintiff further alleges that as a result of this information investors were lured into believing that their funds would be utilized in the operation and expansion of a telephone company that offered local and long distance service to credit impaired individuals or in the operation of an expanding insurance business spanning several states. (Dkt.52)

■ "Allegations of fraud in the securities context should be stated with particularity because generally the information giving rise to the action is available before commencement of the suit." *Viscomi v. Paine, Webber, Jackson & Curtis, Inc.*, 596 F.Supp. 1537, 1539 (S.D.Fla.1984). Logically, where such information is not available before commencement, this requirement should be relaxed. Allegations of fraud based on information and belief do not usually satisfy the degree of particularity required under Rule 9(b). *Zatkin v. Primuth*, 551 F.Supp. 39, 42 (S.D.Cal. 1982). However, an exception exists where plaintiffs cannot be expected to have personal knowledge of the facts constituting the wrongdoing. *See Id.* In such cases, a complaint based on information and belief is sufficient if it includes a statement of the facts upon which the belief is based. *See Id.* Because the Physicians Guardian Enterprise was ongoing at the time that Plaintiff's Complaint for Injunctive and other Relief was submitted, the Commission did not have the opportunity to perform a full investigation of all the facts. (Docket No. 52). Furthermore, Plaintiff can not be expected to have personal knowledge of all the facts surrounding Defendant Polley's wrongdoing. Therefore, a statement of the facts based on Plaintiff's belief would be sufficient to satisfy Fed.R.Civ.P. 9(b). Plaintiff has provided an extensive list of facts based on its belief, supplemented by various documents and exhibits.

Additionally, the purpose of Fed.R.Civ.P. 9(b) is to ensure that allegations are specific enough to provide defendants sufficient notice of the acts complained of and to enable them to prepare an effective response and defense, to eliminate those complaints filed as a pretext for the discovery of unknown wrongs, and to protect defendants from unfounded charges of wrongdoing that injure their reputations and goodwill. *See Viscomi*, 596 F.Supp. at 1539 (quoting *Benoay v. Decker*, 517 F.Supp. 490, 492 (E.D.Mich.1981)). It is this Court's belief that the Complaint, along with hundreds of pages of exhibits, FBI transcripts, and other documents filed with the complaint provided detailed factual allegations referencing dates and places to give adequate notice to Defendant Pol-

ley to enable him to prepare an adverse pleading.

## II. Rule 10(b) and Rule 10b–5 Requirements

A successful cause of action under Section 10(b) and Rule 10b–5 of the Exchange Act requires proof of a(1) misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately caused the plaintiff's loss. Scienter may be established for purposes of Rule 10b–5 by proof of misconduct which is knowing or extremely reckless in that it reflects extreme departure from standards of ordinary care. Securities Exchange Act of 1934, Section 10(b). By pleading, through Plaintiff's complaint, various exhibits and other documentation, that Defendant Polley held pivotal roles within the separate offerings, made various disseminations and communications containing allegedly fraudulent material, coordinated sales efforts, and signed at least one operating agreement, Plaintiff has sufficiently plead that Defendant Polley either knew, or was extremely reckless in not knowing of the alleged fraudulent representations.

The Court concludes that Plaintiffs' Complaint alleges fraud and misrepresentation as to all counts with sufficient particularity to survive a Rule 12(b)(6) motion to dismiss. Accordingly, it is

**ORDERED** that Defendant, Charles Polley's, Motion (Dkt.47) to Dismiss is **denied.**