Paul W. ZELL, Plaintiff-Appellant,

v.

INTERCAPITAL INCOME SECURITIES, INC., C. Fiumerfreddo, D. Greenwald and R. Long, Defendants-Appellees.

Nos. 78–3749, 78–3754.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 17, 1980.

Decided April 27, 1982.

David B. Gold, San Francisco, Cal., for plaintiff-appellant.

John B. Bates, Michael H. Salinsky, Stephen Stublarec, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellees.

Before BROWNING, Chief Judge, TRASK, Circuit Judge, and JAMESON,* District Judge.

BROWNING, Chief Judge:

Plaintiff, a shareholder in InterCapital Income Securities, Inc. (the Fund), brought this action on behalf of himself and other shareholders charging defendants violated various provisions of federal securities laws, including Section 14(a) of the Securities Ex-

---

* Honorable William J. Jameson, Senior Judge, United States District Court for the District of Montana, sitting by designation.

change Act of 1934 and Rule 14a–9, by failing to disclose material information in two proxy statements. The statements solicited approval by the Fund's shareholders of Investment Advisory Agreements with the Fund's Investment Manager, Dean Witter InterCapital, Inc. ("DWI") later renamed Dean Witter Reynolds InterCapital, Inc.[1] The proxy statements failed to disclose a score of lawsuits charging violations of state and federal securities laws pending against the Dean Witter Organization ("DWO"), the parent of the Fund's Investment Manager, and Dean Witter, Inc. ("DW"), the parent's wholly-owned brokerage subsidiary.[2]

The district court granted defendants' motion for summary judgment on the ground that, as a matter of law, the omitted information was not material to stockholders in deciding whether to approve the proposed Investment Advisory Agreements with DWO's subsidiary, DWI, the Investment Manager. We reverse and remand.

## I.

The allegations of the complaint are as follows. InterCapital (the Fund) is an investment fund investing primarily in fixed-income securities, and is registered pursuant to Section 8 of the Investment Company Act of 1940, 15 U.S.C. § 80a–8. The Fund and its officers and directors are controlled by DWO and DW. DWI is the Fund's Investment Manager, and is a wholly-owned subsidiary of DWO. Officers and directors of DWO and DW constitute a majority of DWI's board of directors. DWO is the holding company for both DW and the Investment Manager, DWI. DWO controls DWI by virtue of its ownership of the stock of DWI and its dominance and control of DWI's board of directors.

In July 1977, the Fund issued a proxy statement soliciting proxies to be voted in favor of approval of an Investment Adviso-

ry Agreement between the Fund and DWI. In recommending approval, the proxy statement represented that DWI's parent, DWO, was "responsibly managed" and that DWO's "financial strength and the quality of its investment skills" were factors that warranted approval of the proposed Investment Advisory Agreement with DWO's subsidiary, DWI.

These representations were false and misleading in that the proxy statement failed to disclose that DWO and DW "had been named as defendants in at least twenty-two major lawsuits arising out of Dean Witter's business activities, including Dean Witter's activities as a securities broker, commodities broker and investment banker."

The lawsuits were listed and described in DWO's annual report Form 10–K filed with the Securities Exchange Commission for fiscal year 1977, attached to the complaint. They alleged various violations of federal and state securities laws, including anti-fraud provisions of the Investment Adviser Act of 1940, 15 U.S.C. § 80b–1 et seq. In ten of the suits, damages were sought totalling more than 200 million dollars, approximately 25% of the consolidated assets of the Dean Witter corporations. As a result of these suits, the complaint alleged, "Dean Witter is subject to a substantial potential liability which would adversely affect its financial position. The existence of these lawsuits also casts serious doubt on the quality of Dean Witter's investment management skills."

The complaint further alleged that a second proxy statement was issued by the Fund in November 1977, soliciting proxies in favor of approval of a new Investment Advisory Agreement with DWI. This proxy statement repeated the representations in the earlier proxy regarding the financial strength and management skills of DWO, and the importance of these factors to the recommendations that the Fund's stockholders approve the new Investment

---

1. We will refer to both Dean Witter InterCapital and Dean Witter Reynolds InterCapital as "DWI."

2. The parties dispute whether DWO was a named party in these actions. For purposes of the motion for summary judgment, the district court assumed it was. Since discovery was foreclosed we do so as well.

**1044**

Advisory Agreement with DWO's subsidiary, DWI.

Plaintiff initiated discovery to secure additional information regarding the relationship among the Dean Witter corporations, the nature of litigation, and the consideration given to the litigation in connection with approval of the proposed management agreements with DWI. Defendants objected to this discovery on the ground the information sought was irrelevant because the only issue was whether the litigation described in DWO's Form 10–K should have been described in the proxy statements, and the Fund had relied upon DWO's statement in the Form 10–K report that these lawsuits "in the opinion of the management will be resolved with no material effect on the consolidated financial position of the Company." Defendants asserted the discovery was burdensome and oppressive because they were entitled to judgment as a matter of law, and were preparing a motion for summary judgment.

Shortly thereafter defendants filed the promised motion for summary judgment, arguing they were entitled to judgment on the existing record (1) because Rule 14a–3 requires that a proxy statement include information on the financial condition only of the issuer, and not of a parent of the issuer or another subsidiary of a parent, and (2) because the Fund was entitled to rely on DWO's assessment that the litigation would be resolved with no material adverse effect on the consolidated financial condition of DWO.

Plaintiff's opposition to the motion for summary judgment was based in part on the ground that lack of discovery rendered the motion premature. Plaintiff filed a motion to compel discovery pointing out that the discovery sought bore directly upon the impact of the litigation upon DWO's financial standing and the quality of its management, and upon whether the Fund had relied upon the DWO's evaluation of the impact of the litigation on DWO's financial condition. Defendant opposed the motion and asked that discovery be postponed until the court ruled on defendants' request for summary judgment, arguing:

Defendants have moved for summary judgment on the ground that litigation pending against other corporate entities was immaterial to shareholders of the Fund. If defendants' position is upheld by the Court, and the motion for summary judgment is granted, the discovery objections will in effect have been sustained.

Defendants concluded: "Orderly procedure in this case requires postponement of this discovery."

The district court took both the motion for summary judgment and the motion to compel discovery under advisement. The court granted the motion for summary judgment, implicitly denying the motion for discovery, and holding that as a matter of law the omitted information was not material.

## II.

The district court agreed with defendants that Schedule A, 17 C.F.R. § 240.-14a–101, of Rule 14a–3(a), did not require an issuer (*i.e.*, the Fund) of a proxy statement to describe the contingent liabilities of "third parties," in the position of DWI, DWO, or DW. Plaintiff does not contest this holding on appeal. The district court did not, however, agree with defendants that for this reason alone disclosure of the litigation against DWO and DW was not required. The court was correct. "Schedule 14A sets *minimum* disclosure standards. Compliance with this schedule does not necessarily guarantee that a proxy statement satisfied Rule 14a–9." *Maldonado v. Flynn,* 597 F.2d 789, 796 n.9 (2d Cir. 1979) (emphasis added). Rule 14a–9 prohibits inclusion in a proxy solicitation of any statement that is false or misleading with respect "to any material fact," or omission from a proxy solicitation of "any material fact" necessary to make statements in the solicitation not false or misleading.

The district court recognized the test of materiality established by *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)

("[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote"), and noted that materiality is "a mixed question of law and fact" resolvable by summary judgment only if the omitted fact is so obviously unimportant that no reasonable shareholder could have viewed it as significantly altering the "total mix" of information made available to stockholders. 426 U.S. at 449, 450, 96 S.Ct. at 2132–2133. The district court noted that "it is not claimed any of those lawsuits had any relationship to the activities or operations of the Fund or of the Investment Manager," and concluded that, as a matter of law, the connection between the litigation against DWO and DW and the shareholder's decision whether to approve the Investment Advisory Agreement between the Fund and the Investment Manager DWI was "too remote" to require disclosure.

 It was and is plaintiff's theory that the litigation pending against the holding company, DWO, and its broker subsidiary, DW, had a significant bearing upon the financial stability and quality of management of these entities, and that their financial stability and quality of management, in turn, were significant to stockholders of the Fund in assessing the desirability of entering into a Management Advisory Contract with the Investment Management subsidiary DWI. The district court erred in rejecting as a matter of law plaintiff's position.

Obviously, pending litigation may be relevant to the quality of a corporation's management. Prior breaches of fiduciary duties or violations of securities statutes and regulations may have a direct bearing on managerial integrity.[3] SEC regulations and forms expressly require disclosure of involvement in such legal proceedings.[4] Litigation involving substantial exposure to damages may affect a corporation's financial status. For instance, SEC rules require disclosure in registration statements and annual reports of litigation other than ordinary routine litigation incidental to the registrant's business seeking damages in excess of 10% of the consolidated assets of the registrant.[5]

 The suits against DWO and DW are numerous. They allege fraud, breach of fiduciary duty, and other misconduct violative of the securities laws. They seek damages of more than 200 million dollars, 25% of DWO's consolidated assets. The mere pendency of litigation is no warrant of its merit. On closer examination the implications of this litigation may be less significant than appears. But summary judgment was improper. Defendants have foreclosed discovery that could have provided a basis for a more accurate evaluation of the probable impact of the litigation. Plaintiff alleged the litigation pending against DWO and DW exposes Dean Witter to "substantial potential liability which

**3.** See SEC v. Savoy Industries, Inc., 587 F.2d 1149, 1165–66 (D.C.Cir.1978); Berkman v. Rust Craft Greeting Cards, Inc., 454 F.Supp. 787, 791–92 (S.D.N.Y.1978); SEC v. Joseph Schlitz Brewing Co., 452 F.Supp. 824, 829 (E.D.Wisc. 1978); SEC v. Kalvex, Inc., 425 F.Supp. 310, 315 (S.D.N.Y.1975); Cooke v. Teleprompter Corp., 334 F.Supp. 467, 470–71 (S.D.N.Y.1971); In the Matter of Franchard Corp., 42 S.E.C. 163, 169, [1964–66 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 77,113 at 82,038 (S.E.C.1964). See also Cohen v. Ayers, 449 F.Supp. 298, 317 (N.D.Ill.1978), aff'd, 596 F.2d 733 (7th Cir. 1979); Bertoglio v. Texas Intern. Co., 488 F.Supp. 630, 661 (D.Del.1980); Robinson v. Penn Central Co., 336 F.Supp. 655, 658 (E.D.Pa. 1971); Beatty v. Bright, 318 F.Supp. 169, 173 (S.D.Iowa 1970); Rafal v. Geneen, [1972–73 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,505

(E.D.Pa.1972). Cf. Shapiro v. Belmont Industries, Inc., 438 F.Supp. 284, 292 (E.D.Pa.1977); 2 I. Frankel, The Regulation of Money Managers, 138–39 (1978).

**4.** See Item 16 of Form ADV (application for registration as an investment advisor); 15 U.S.C. §§ 80a–9 and 80b–3(e). See also Regulation S–K, item 3, 17 C.F.R. § 229.20 (1981); Schedule 14A, 17 C.F.R. § 240.14a–101 (1981); Schedule 14B, item 2(d), 17 C.F.R. § 240.14a–102 (1981); 17 C.F.R. § 240.14a–9 (1981); Securities Act Form S–1, item 16(e), 17 C.F.R. § 239.11 (1981); Securities Exch. Act Form 10–K, item 13, 17 C.F.R. § 249.310 (1981).

**5.** See item 12 of Form S–1, item 3 of Form 10–K, and item 5 of SEC Reg. S–K.

would adversely affect its financial position," and "create serious doubt on the quality of Dean Witter's investment management skills." Nothing in the present record bars the possibility that after discovery plaintiff may be able to support these allegations with proof. Furthermore, the moving party has the initial "burden of showing the absence of a genuine issue of any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). *See* 10 C. Wright & A. Miller, *Federal Practice & Procedure*, § 2739, pp. 716–19 (1973). It cannot be inferred from the present record that the litigation omitted from the statements would have no substantial significance to a reasonable stockholder in assessing the financial condition and quality of management of the defendants to the suits, DWO and DW.

The substantial question, and the question upon which the district court decision turned, is whether there is a substantial likelihood that a reasonable stockholder of the *Fund* would consider the financial condition and quality of the management of DWO and DW to have actual significance in deliberating whether to approve the proposed Investment Management Agreement with DWI. The district court concluded that reasonable minds could not differ on

the lack of importance of this information to stockholders of the Fund. We disagree.

The most obvious reason for concluding a reasonable stockholder of the Fund would consider DWO's financial stability and management skill and integrity significant, is that each of the two proxy statements informed the stockholders that in the opinion of the Fund's directors these were indeed important factors.[6]

The special relationship between an investment company, often referred to as a mutual fund, and its investment manager counsels reasonable stockholders of the investment company to examine with great care any matter relevant to the stability, integrity, and skill of a proposed investment manager. The fund is a shell, a pool of assets consisting of securities, belonging to the shareholders of the fund. The fund is usually organized by the manager. The manager selects the fund's investments and operates its business, providing expertise, personnel, and office space. The manager dominates the fund; the latter is not free to terminate the relationship. As the Supreme Court noted in *Burks v. Lasker*, 441 U.S. 471, 481, 99 S.Ct. 1831, 1838, 60 L.Ed.2d 404 (1979):

> "Since a typical fund is organized by its investment adviser which provides it with almost all management services

---

**6.** The first proxy statement recited that the Fund's directors had received and considered information regarding DWO's business organization and financial resources, and that the recommendation that the Investment Management Agreement be approved was based in part upon this information. The proxy statement continued:

> In connection with the foregoing, the Directors have considered the fact that Dean Witter is a large, well-established company with substantial resources. The independent Directors believe it is reasonably managed, and that its management has a continuing interest in investment management operations. In the judgment of the independent Directors, Dean Witter's financial strength and stability and quality of Dean Witter's management are important factors.

The second proxy statement repeated the above paragraph from the first proxy statement, and continued:

> Based on the information provided to them and their discussion with the Dean Witter Organization representative, the Independent Directors believe that the financial strength and stability of the Dean Witter Organization, which are already substantial, will be further enhanced by the merger, and that the nature and quality of services previously provided to the Fund, and the responsibilities for the Fund's operations previously assumed, by the Fund's Investment Manager will continue to be provided and assumed by the Investment Manager whether or not the merger is consummated. The Independent Directors, therefore, believe that the reasons supporting their approval of the Present Investment Management Agreement are equally applicable to the New Management Agreement and that its approval is in the best interests of the Fund and its stockholders.

..., a mutual fund cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." S.Rep.No.91–184, p. 5 (1969).

As a consequence, "[t]he relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 808 (CA2 1976).[7] Indeed, it was Congress' concern "about the potential for abuse inherent in the structure of investment companies," *id.* at 480, that led to the enactment of the Investment Company Act of 1940, 15 U.S.C. § 80a–1 *et seq.* "Since the advisory contract represents a delegation of a substantial part of the functions of the board of an investment company and the adviser usually controls the company ...," 2 Frankel, *The Regulation of Money Managers*, 212–13 (1978), the 1940 Act specifically requires approval of the investment advisory contract by a vote of the shareholders of the investment company, 15 U.S.C. §§ 80a–15(a) and (c).

The provisions of the 1940 Act clearly reflect the judgment of Congress that stockholders of the investment company have a substantial interest in evaluating the new owners of an investment manager. The Act declares that the interest of the investors, as well as the public interest, is adversely affected by a change in management of an investment company without the consent of its stockholders. 15 U.S.C. § 80a–1(b)(6). A transfer of a controlling interest in an investment company's investment manager constitutes a change in control of the management of the investment company. *SEC v. Insurance Securities, Inc.*, 254 F.2d 642, 648–49 (9th Cir. 1958). Accordingly, the Act provides that a change in ownership control of the investment manager constitutes an assignment of the investment advisory agreement, 15 U.S.C. § 80a–2(a)(4), results in a termination of the agreement, 15 U.S.C. § 80a–15(a)(4), and requires approval of a new agreement, or reapproval of the old, by the investment company's shareholders. *Ibid.*[8]

Both of the proxy statements involved in this case were issued because of a change in ownership of the investment manager, DWI. The change that occasioned the issuance of the first proxy statement was the substitution of DWO for Standard and Poors as the sole owners of DWI; the change that resulted in the issuance of the second proxy statement was the substitution of DWO after its merger with Reynolds Securities International Inc., for DWO before the merger. The investment manager did not change. The Investment Advisory Agreement did not change. Only the ownership of DWI changed.

The effective exercise of stockholder consent to a continuation of the same contractual arrangement for management services with the same investment manager under new ownership depended upon the receipt of accurate information about the new owners. There was no other issue. To hold that information bearing significantly upon the financial status, integrity, and management skills of the new owners was not

---

7. *See generally Tannenbaum v. Zeller*, 552 F.2d 402, 405 (2d Cir. 1977); *Fogel v. Chestnutt*, 533 F.2d 731, 734–35 (2d Cir. 1975); *Moses v. Burgin*, 445 F.2d 369, 376 (1st Cir. 1971); Mundheim, *Some Thoughts on the Duties and Responsibilities of Unaffiliated Directors of Mutual Funds*, 115 U.Pa.L.Rev. 1058, 1059–61 (1967); Note, *Mutual Fund Independent Directors: Putting a Leash on the Watchdogs*, 47 Fordham L.Rev. 568 (1979); Farina, Freeman, and Webster, *The Mutual Fund: A Legal Survey*, 44 Notre Dame Law. 732, 749–50 (1969); Randall, *Fiduciary Duties of Investment Company Directors and Management Companies Under the Investment Company Act of 1940*, 31 Okla.L.Rev. 635, 636 (1978); 2 I. Frankel, *The Regulation of Money Managers*, 77, 81 (1978).

8. Congress' recognition of the relevance to investors of the integrity of those who control the investment adviser is also reflected in provisions of the Act authorizing the Commission to revoke the registration of an investment adviser if any person associated with it, including those who directly or indirectly control the adviser, has been found to have engaged in certain misconduct, particularly in relation to the securities business. 15 U.S.C. §§ 80b–2(a)(17) and 80b–3(e).

material to the Fund's stockholders would deprive the entire stockholder voting process mandated by the Act of any significance.

The significance to the Fund's stockholders of the financial stability, integrity, and management skills of DWI's affiliated corporations is heightened by the apparent integration of control, finances, and functions among the members of the Dean Witter corporate family. Viewed in plaintiff's favor, the present record established the following facts. DWO owns all of the stock of both DW and DWI. Ten of the eleven members of DWO's board are DW directors. Seven of DW and DWO's directors sit on DWI's nine-member board. DWI's balance sheet of August 31, 1977 showed total assets of $134,000, a minimal amount compared with DWO's consolidated assets of over $850,000,000. When DWI was acquired from Standard and Poors on September 1, 1977, DWO made a cash contribution to DWI of $500,000, increasing DWI's assets over fourfold. Plaintiff alleged, and in the absence of discovery the district court properly assumed, that DW dominated the corporate family, and performed nearly all of the financial services provided by the Dean Witter corporations. Indeed, it is conceded that "[d]ue to the integration of the operations of their services and the common usage of personnel and facilities, it is impractical under existing accounting systems to allocate to each revenue source its share of such joint expense."

Defendants argue that the financial stability and management skill of DWI are not dependent upon those of DWO and DW. But defendants successfully resisted discovery on these matters, and the evidence now in the record must be viewed in plaintiff's favor. On the present record, a trier of fact could conclude that DWO, DW and DWI were in substance a single interrelated business entity; that the financial condition and quality of management of DWO and DW were inseparable from those of DWI; and that there was a substantial likelihood that information regarding litigation bearing significantly upon the financial stability and management integrity and skill of

DWO and DW would be considered by reasonable stockholders of the Fund "as having significantly altered the 'total mix' of information made available" in soliciting approval of the management advisory agreements with DWI. *TSC Industries, Inc., supra,* 426 U.S. at 449, 96 S.Ct. at 2132.

### III.

■ The district court did not adopt defendants' argument that the Fund was not required to disclose the litigation as summarized in DWO's Form 10–K because the statement also contained the recital that in the opinion of DWO's management the litigation "will be resolved with no material effect on the consolidated financial position" of DWO.

In the district court, defendants took the position that in preparing its proxy statement the Fund was entitled to rely upon DWO's evaluation of the litigation and, on the basis of this evaluation, to omit mention of the litigation as not material. One difficulty with this position is that defendants prevented plaintiff from obtaining discovery directed to whether the Fund had in fact justifiably relied upon DWO's evaluation.

In any event the contention is not made on appeal. In this court defendants argue that if the Fund had included the Form 10–K summary of the litigation in the proxy statements, the evaluation of the litigation by DWO would have been included as well, and this addition would have rendered the description of the litigation immaterial to a reasonable stockholder. DWO's unilateral assertion that the litigation was immaterial, while perhaps properly includable in a proxy statement, is not binding on the court or on the shareholders and does not justify complete omission from proxy material of any reference at all to the litigation. If defendants' argument is that the omission, if error, was harmless, the answer is that a reasonable stockholder of the Fund might have discounted DWO's self-serving appraisal of the litigation and drawn his own inferences from the infor-

mation in the proxy statement or other information further inquiry might have led him to discover. Knowledge of the litigation might at least have led stockholders to give "more careful scrutiny" to the proposed contract. Cf. *Mills Electric Auto-Lite Co.*, 396 U.S. 375, 384 n.6, 90 S.Ct. 616, 621 n.6, 24 L.Ed.2d 593 (1970).

The district court's analysis took a different tack. The court construed plaintiff's claim as "limited to the assertion that omission of the bare litigation information published in DWO's Form 10–K violated proxy regulations." The court noted that the litigation information in the Form 10–K consisted of "over five closely-printed pages identifying lawsuits, listing the parties involved and claims made along with DWO's and DW's denials." The court concluded that such information could have

> no significance to a reasonable shareholder and would not enhance his ability to make an informed decision on the question whether the advisory agreement should be approved, . . . [because] it tells them nothing of the merits of the claims made in the litigation, the underlying facts leading to the litigation, the likely financial impact on the investment manager, or how, if at all, any of this information may bear on the decision whether to approve the advisory agreement. Aside from being uninformative on its face, moreover, it has a likely tendency by its sheer volume and technical appearance to mislead a shareholder, implying the existence of substantial and relevant claims when in fact none may exist.

The district court placed too restrictive a cast upon plaintiff's contention. Plaintiff contends the proxy statements were misleading because they omitted any information regarding the litigation against DWO and DW. Plaintiff referred to the listed suits in DWO's Form 10–K to identify the litigation and demonstrate its existence, but plaintiff's claim does not turn upon the adequacy or inadequacy of this particular description of the suits. Plaintiff does not assert that the disclosure requirement could be satisfied only by an exact duplication of the information in the Form 10–K; and defendants do not contend that the substance of the litigation information, assuming its materiality, could not have been summarized and presented in an informative manner. The volume of pending litigation and the technical appearance of the information in the Form 10–K does not excuse the complete omission of otherwise material information from the proxy statements. The question presented is not what description of the litigation would have been adequate, but whether the litigation could be ignored.

## IV.

In view of the general scope and subject matter of the litigation against DWO and DW, the express reliance upon the financial stability and quality of management of these corporations in the Fund's proxy statements, the special nature of the relationship between an investment company and its investment adviser, and the apparently close relationship among the members of the Dean Witter family of corporations, it cannot be said that the omitted information was so obviously unimportant that no reasonable Fund stockholders would consider it of actual significance in determining whether to approve investment management agreements with DWI. Drawing the inferences from the present record in plaintiff's favor for purposes of summary judgment, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), we cannot conclude the litigation was immaterial as a matter of law to the shareholders' evaluation of DWI as investment adviser to the Fund. It was therefore error to grant the motion for summary judgment. Cf. *TSC Industries, supra*, 426 U.S. at 450, 96 S.Ct. at 2133.

Summary judgment was premature. It is not necessarily foreclosed. After plaintiff has been afforded reasonable discovery, defendants may renew their motion if they can establish upon a more developed record that the pending litigation was in fact so baseless or so unrelated to the qualifications and financial stability of the Fund's invest-

**1050**

ment adviser that a reasonable shareholder would not have considered the information significant in voting on the Investment Advisory Agreements.

REVERSED and REMANDED.