**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-2131**

SOLOMON STRATTON,

Plaintiff – Appellant,

v.

MECKLENBURG COUNTY DEPARTMENT OF SOCIAL SERVICES; US
DEPARTMENT OF HEALTH & HUMAN SERVICES; UNITED WAY OF
CENTRAL CAROLINAS; FOUNDATION FOR THE CAROLINAS; COUNCIL
FOR CHILDREN'S RIGHTS; BRETT LOFTIS; MARTHA CURREN; DAVID
CAYER; YVONNE MIMS-EVANS; ELIZABETH MILLER-KILLEGREW;
MARGARET SHARPE; SIDNEY EAGLES; JOHN MARTIN; MARTHA GEER;
PATRICIA TIMMONS-GOODSEN; MECKLENBURG COUNTY; RICHARD
JACOBSEN; TYRONE WADE; TWYLA HOLLINGSWORTH; DONNA FAYKO;
GRETCHEN CALDWELL; SHERRI GLENN; DAVID FEE; LISA LOOBY;
SUSAN MILLER; KATHERINE DORMINEY; ROBERT ADDEN; RICHARD
LUCY; MICHAEL SCHMIDT; CAROLINAS HEALTHCARE SYSTEM,

Defendants – Appellees.

-------------------------------------

PETER BOWMAN RUTLEDGE,

Court-Assigned Amicus Counsel.

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte. David C. Norton,
District Judge. (3:10-cv-00137-DCN-KM)

Argued: March 22, 2013                    Decided: May 31, 2013

Before KING, GREGORY, and KEENAN, Circuit Judges.

Affirmed by unpublished per curiam opinion. Judge Gregory wrote a separate concurring opinion.

———————

**ARGUED:** Lucas D. Bradley, UGA APPELLATE LITIGATION CLINIC, Athens, Georgia, for Court-Assigned Amicus Counsel. Robert Evans Harrington, ROBINSON, BRADSHAW & HINSON, PA, Charlotte, North Carolina; Robert S. Adden, Jr., Charlotte, North Carolina, for Appellees. **ON BRIEF:** Peter B. Rutledge, Matthew V.H. Noller, UGA APPELLATE LITIGATION CLINIC, Athens, Georgia, for Court-Assigned Amicus Counsel. Sinead Noelle O'Doherty, Adam K. Doerr, ROBINSON, BRADSHAW & HINSON, PA, Charlotte, North Carolina, for Appellees Council for Children's Rights and Brett Loftis; Michael Gray Gibson, DEAN & GIBSON, LLP, Charlotte, North Carolina, for Appellee United Way of Central Carolinas. Grady L. Balentine, Jr., Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees Martha Curren, David Cayer, Yvonne Mims-Evans, Elizabeth Miller-Killegrew, Margaret Sharpe, Sidney Eagles, John Martin, Martha Geer, and Patricia Timmons-Goodsen. Charles Evans Johnson, ROBINSON, BRADSHAW & HINSON, PA, Charlotte, North Carolina, for Appellee Carolinas Healthcare System. Kelly Suzanne Hughes, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC, Charlotte, North Carolina, for Appellee Foundation for the Carolinas; Cynthia L. Van Horne, POYNER SPRUILL LLP, Charlotte, North Carolina, for Appellee Michael Schmidt; Richard Lucey, Charlotte, North Carolina, for Appellee Richard Lucey.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Solomon Stratton appeals from the district court's Order of September 16, 2011, which adopted the report and recommendations of a magistrate judge and dismissed the operative complaint in this case for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and the Rooker-Feldman doctrine. See Stratton v. Mecklenburg Cnty. Dep't of Soc. Svcs., 3:10-cv-00137 (W.D.N.C. Sept. 16, 2011), ECF No. 115 (the "Order").[1] The complaint alleges that a centuries-old international child trafficking enterprise had orchestrated and caused the termination, by the state courts of North Carolina, of the parental rights of Jack and Kathy Stratton (sometimes referred to as the "Strattons") with respect to nine of their children. The complaint alleges eight claims involving a total of thirty defendants, including governmental entities, charitable organizations, and various judges and other individuals. As explained below, we are satisfied to affirm the dismissal by the district court, relying on the Rooker-Feldman and substantiality doctrines.

---

[1] The district court's unpublished Order is found at J.A. 475-76. (Citations herein to "J.A. ____" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

I.

A.

On March 22, 2010, Solomon Stratton and his father, Jack Stratton, filed their pro se complaint in the Western District of North Carolina. Six months later, on September 24, 2010, they filed an amended pro se complaint, which constitutes the operative complaint in this appeal (the "Complaint").[2] Although the plaintiffs initially sued only one defendant, the Mecklenburg County Department of Social Services (the "County DSS"), the Complaint names twenty-nine additional defendants, including three governmental entities,[3] several charitable organizations,[4] and more than twenty individuals, eight of them North Carolina judges.[5]

---

[2] The Complaint is found at J.A. 96-159.

[3] The governmental defendants include the United States Department of Health and Human Resources, North Carolina's Mecklenburg County, and the County DSS (named only in the initial pro se complaint). Although the County DSS was not specifically named as a defendant in the Complaint, it has been treated as a party defendant in the district court and throughout these proceedings.

[4] The charitable defendants are the United Way of Central Carolinas, the Foundation for the Carolinas, the Council for Children's Rights, and the Carolinas Healthcare System.

[5] The individual defendants include Brett Loftis, Director of the Council for Children's Rights; Martha Curran, a court clerk in Mecklenburg County; David Cayer, formerly a state judge and now a federal magistrate judge; Yvonne Mims-Evans, a state judge; Elizabeth Miller-Kelligrew, a former state judge; Margaret Sharpe, a former state judge; Sidney Eagles, a former
(Continued)

4

The various claims generally stem from the state courts' termination of the parental rights of Jack and Kathy Stratton with regard to nine of their ten children, including plaintiff Solomon Stratton. The Complaint consists of sixty-four pages and more than 400 paragraphs. Its extensive allegations relate, inter alia, to the seizure in 2001 of the Stratton children by the County DSS, the termination of the Strattons' parental rights by the North Carolina courts, and the court-ordered placement of their children into foster care. For example, the Complaint alleges that the "[p]laintiffs and their family are victims of an Enterprise engaged in international child trafficking [that] seizes children for purposes of pedophilia and human child sacrifice." Complaint ¶ 443. It further alleges that these occurrences were part of what it denominates an "International Luciferian Child Trafficking Criminal Enterprise." Id. at 5. This enterprise is part of a "Rothschild-Rockefeller-Illuminati-Federal Reserve-New World

state judge; John Martin, a state judge; Martha Geer, a state judge; Patricia Timmons-Goodsen, a former state judge; Richard Jacobsen, former County DSS director; Tyrone Wade, deputy Mecklenburg County attorney; Twyla Hollingsworth, County DSS attorney; County DSS supervisors Donna Fayko, Gretchen Caldwell, Sherri Glenn, David Fee, and Lisa Looby; County DSS social worker Susan Miller; former County DSS supervisor Katherine Dorminey; County DSS attorney Robert Adden; attorney Richard Lucey; and attorney Michael Schmidt.

5

Order conspiracy" that began with the establishment of the Rothschild banking empire in 1744 in Frankfurt, Germany. Id. ¶ 359. Through the "Rothschild control of the issuance of money," the Rothschilds and the Illuminati were able to "systematically take over and control the governments of Europe." Id. ¶ 51. These conspirators thereafter successfully obtained control of the government of the United States, through the establishment of the Federal Reserve system, and they now control "every major business corporation," as well as "[e]very government on earth." Id. ¶¶ 73, 74.

As a result of the foregoing, the Complaint explains, our entire planet is "now operating under a Luciferian (Satanic) shadow world government." Complaint ¶ 74. In addition, the Complaint contends that "an international Satanic child trafficking conspiracy operates within 'child protective services' and the CIA," with "a CIA covert child trafficking operation" providing children "used by Satan worshippers for human sacrifices." Id. ¶¶ 101, 107. The Complaint continues in that same vein, alleging that "there are approximately four million practicing Satan worshippers across the United States, many of them operating at the highest levels of the United States government." Id. ¶ 102. In addition, "pedophile sex orgies with high ranking federal officials" occur at the White House and at the "Bohemian Grove," where, for more than 120

6

years, "world leaders have . . . participate[d] in bizarre Satanic rituals." Id. ¶¶ 104, 109-10.

The Luciferian conspiracy allegations of the Complaint are interwoven into various descriptions of the state court proceedings concerning the Strattons that occurred more than ten years ago in North Carolina. According to the Complaint, the conspiracy procured the seizure of the Stratton children through the fabrication of various court documents, in order to obtain jurisdiction over the Stratton family and its members outside of their county of residence. It is alleged that, following the removal and detention of their children, the Strattons were not afforded the notices and hearings mandated under North Carolina law.[6] The Complaint also alleges that the defendants' actions were motivated in part by the Strattons being Christians and their children biracial. It then alleges that, while in the custody of the County DSS, plaintiff Solomon Stratton was forced to attend public school against his will, and that he was

---

[6] The Juvenile Code of North Carolina is codified at Chapter 7B of the North Carolina General Statutes. Subchapter I thereof establishes procedures for the processing in the state courts of juvenile cases involving abuse, neglect, and dependency. See N.C. Gen. Stat. §§ 7B-100 to 1414. Those procedures include, inter alia, the appointment of counsel for indigent parents, the appointment of guardians ad litem to represent juveniles, and the conduct of various judicial proceedings to assess and determine the need for custody by the state. See id. §§ 7B-506, 601, 602.

7

subjected to medical procedures to which neither he nor his parents consented.

On the basis of its extensive factual allegations, the Complaint identifies eight causes of action:

Claim I (42 U.S.C. § 1983): The defendants conspired to violate the plaintiffs' rights under multiple amendments to the Constitution of the United States.

Claim II (42 U.S.C. § 1985): The defendants, motivated by race, religion, and sex, conspired to violate the plaintiffs' constitutional rights.

Claim III (18 U.S.C. § 1964): The defendants conspired, in furtherance of the international criminal enterprise, to commit, inter alia, child kidnapping, child torture, ritualistic child sexual molestation, drugging of children, and human child Satanic sacrifices.

Claim IV (18 U.S.C. § 1595): The defendants violated the Thirteenth Amendment by forcing Solomon and his siblings into slavery and involuntary servitude.

Claim V (42 U.S.C. § 2000d): The defendants violated Title VI of the Civil Rights Act of 1964.

Claim VI (42 U.S.C. § 2000bb-1): The Department of Health and Human Services of the United States (the "DHHS") violated the plaintiffs' rights under Religious Freedom Restoration Act.

Claim VII (assault and battery): The defendants, except defendant Schmidt, committed the state law tort of assault and battery by kidnapping Solomon and subjecting him to medical examinations without his consent or the consent of his parents.

Claim VIII (legal malpractice): Defendant Schmidt, an attorney, committed legal malpractice against Jack Stratton by refusing to turn over his Stratton case file.

8

For relief, the Complaint seeks a declaration from the federal district court that "all orders and judgments used to kidnap and hold [the Stratton children] are void and vacated," plus damages in excess of two and one-half billion dollars. Complaint 63.

B.

1.

On December 18, 2000, the County DSS received a report that the children of Jack and Kathy Stratton, one of whom was plaintiff Solomon Stratton, were living in a home in Charlotte, Mecklenburg County, North Carolina, with inadequate heat and food.[7] The following day, several County DSS employees approached the Stratton home, where they observed the children. Later on December 19, 2000, the Strattons and their children moved from Mecklenburg County to neighboring Gaston County. When the County DSS employees returned to the Stratton home in Charlotte on December 20, 2000, they found it empty, and they inquired about the family's absence from Jack Stratton's mother, Joan Stratton, who lived next door. Joan, however, "refus[ed] to provide the . . . whereabouts of the father and family or where she believe[d] they might be." J.A. 200. As a result,

---

[7] Our recitation of the pertinent facts is drawn primarily from the pleadings, the exhibits thereto, and various state and federal court records. The North Carolina court records referred to herein are judicially noticed and accepted as accurate and factual.

9

the County DSS filed a petition in the state district court in Mecklenburg County on December 21, 2000, alleging that Joan Stratton was "interfering with [the County DSS's] ability to investigate to determine the juveniles' condition," and seeking an order prohibiting further interference by her. Id.[8]

A summons was promptly issued by the state district court directing Joan Stratton to appear the following day, December 22, 2000, in Charlotte, where a hearing was conducted by defendant Cayer (then a North Carolina judge) on the petition.[9] Defendants Wade, Caldwell, Dorminey, and Fayko, as officials of the County DSS, were present on its behalf, and defendant Caldwell presented evidence in support of the petition. On January 26, 2001, the state court entered an order (the "Juvenile Order") containing findings regarding the conditions of the Stratton home, the welfare of the Stratton children, and the obstructive conduct of Joan Stratton.[10] More specifically, the state court found that "none of the nine children had coats and [they] appeared very dirty and unkempt." Juvenile Order 2.

---

[8] The Mecklenburg County District Court is comprised of various divisions, including a Juvenile Court Division. For ease of reference, we use the term "state district court" when referring to proceedings therein.

[9] Judge Cayer served several years as a North Carolina judge, and in 2009 was appointed as a United States magistrate judge.

[10] The Juvenile Order is found at J.A. 206-10.

One of the children "appeared to be blind or visually impaired, [and] was leaning on his mother and appeared to need assistance with walking due to some physical limitation or disability." Id.

In the kitchen of the Strattons' Charlotte home, according to the Juvenile Order, the County DSS employees observed "a large hole in the center of the ceiling with a large plastic barrel collecting water that was dripping from the ceiling." Juvenile Order 2. There was no food in the home other than a small amount "of ground beef and Kool-Aid." Id. In addition, "[t]he bedroom had no furniture at all other than some form of foam mat on the floor." Id. at 3. Although Kathy Stratton told the County DSS officials that "the children were being home-schooled," the officials observed "no books, pens, tablets, or anything that would suggest any form of education was being provided in the home." Id. Furthermore, "at least one child appeared to have some sort of speech impediment." Id. After finding that the Stratton home had been vacated, and that Joan Stratton "ha[d] obstructed and interfered with the investigation," the Juvenile Order concluded that the Stratton family was "fleeing from [the County DSS]," ordered Joan Stratton to fully cooperate with its investigation, and authorized the County DSS "to take whatever measures [are]

11

necessary to locate the whereabouts of [the] family in order to ensure the needs of the juveniles are met." Id. at 3-4.

2.

On January 30, 2001, the County DSS filed a petition in the state district court alleging that the ten Stratton children were neglected and dependent. The neglect petition alleged that, when observed by the County DSS on December 19, 2000, "[t]he children were noticed to be extremely dirty, unkempt, [and] inappropriately dressed for the conditions." J.A. 220. In addition, "[o]ne child appeared to be blind or otherwise physically handicapped," and another child had diabetes. Id. Regarding the Stratton home, the neglect petition recited that

> [t]he family was living in squalid conditions. The home had three small rooms and a bathroom. There were holes in the ceiling in the kitchen and bathroom. There was no running water or working plumbing facilities, no bedding and only sparse furnishings in the other room. There was little to no food observed in the home; however, there was a large tub in the kitchen, containing floating debris, collecting dripping water which appeared stagnated.

Id. As for the children's education, the neglect petition alleged that "the children have not attended school at all," and that "[t]here are no records to support [that] the mother has been licensed to home school the children. In addition, there was nothing in the home to indicate the children were being educated at home." Id. The neglect petition explained that the Stratton family had "relocated to Gaston County, but have gone

12

underground," and it expressed "concerns regarding the quality of care the children might be receiving and the environment in which they might be living." Id. at 221.

Based on the conditions previously observed at the Stratton home in Charlotte, as spelled out in the Juvenile Order, and on the family's move from Mecklenburg County to Gaston County, the neglect petition requested a determination by the state district court of whether the children were "in need of the care, protection, or discipline of the State." J.A. 221. That very day, the state court entered a custody order placing the Stratton children in foster care, with a hearing on the neglect petition to be held within seven days.[11] Also that day, employees of the County DSS travelled to neighboring Gaston County and took custody of the Stratton children.

On February 2, 2001, the state district court conducted a hearing on the matter, and the custody order was superseded by an order placing the children in foster care pending final adjudication of the neglect petition. The foster care order

---

[11] Judge Mims-Evans, a judge in Mecklenburg County, entered the custody order of January 30, 2001, finding that the Stratton children's continuing presence in the family home was contrary to their welfare and best interests, explaining that "the juvenile[s] [are] exposed to a substantial risk of physical injury . . . because the parent, guardian, or custodian has inflicted the injury or abuse; created the conditions causing the injury, abuse, or exposure; failed to provide, or is unable to provide, adequate supervision of protection." J.A. 212.

13

adopted the allegations of the neglect petition as its findings of fact, confirmed that Jack and Kathy Stratton were represented by counsel, and noted that they had consented to the continuing custody of their children by the State of North Carolina. The foster care order also authorized parental visitations with the children, directed the Strattons to cooperate with the County DSS, and instructed the County DSS to assist the Strattons with efforts to procure adequate housing.

A family services case plan, prepared by a County DSS social worker on February 16, 2001, and filed in the federal district court proceedings, identifies the Stratton children and reflects that the County DSS's permanent plan was the Stratton family reunification. Not long after the Stratton children were placed in foster care, however, the County DSS ascertained that none of them had been properly immunized. Their parents objected to any such immunizations on religious grounds. On July 3, 2001, the state district court ruled that it was in the best interests of the Stratton children to receive the necessary immunizations. See In re Stratton, 571 S.E.2d 234 (N.C. Ct. App. 2002) ("Stratton I").

The Strattons thereafter appealed the state district court's immunization order and its denial of their religious objections with respect to immunizations. In its decision rejecting that appeal, the Court of Appeals of North Carolina

14

characterized the Stratton home, prior to the children's removal therefrom, as being in "severe disrepair," with the family "living in squalid conditions." Stratton I, 571 S.E.2d at 235.[12] More specifically, the court related that

> [i]n the kitchen, a large tub caught water dripping from the ceiling. The tub of water had debris floating in it. The plumbing facilities were in disrepair. No beds or mattresses were found throughout the home. Only two working kerosene heaters were seen in the home, despite the cold outside temperature as evidenced by the sleet and freezing rain earlier that day. The [County DSS] workers found almost no food in the home. Although the father-appellant told the workers that mother-appellant had been home schooling the children, the workers found no records or educational materials to support that claim. Appellants stated that none of the children had ever attended public school.

Id. The Strattons thereafter sought further judicial review in the Supreme Court of North Carolina, but were again unsuccessful. See In re Stratton, 573 S.E.2d 512 (N.C. 2002) (finding no right of appeal and denying discretionary review).

3.

On January 31, 2002, a year after the Stratton children had been placed in the custody of the County DSS, the state district court adjudicated the children as neglected and dependent. Jack Stratton then appealed that order to the court of appeals. On

---

[12] The court of appeals panel that rejected the Stratton I appeal was comprised of Judges Sidney Eagles, John Martin, and Patricia Timmons-Goodson, who are named as defendants in these proceedings.

15

October 14, 2002, while the appeal was pending, the County DSS filed petitions in the state district court, seeking permanent termination of the Strattons' parental rights to nine of their children.[13] According to these petitions, the Strattons were unwilling to take the necessary steps to regain custody of their children.[14] The termination petitions alleged that the Strattons had repeatedly failed to comply with the court-ordered family reunification plan by, inter alia, failing to obtain adequate housing, failing to supply evidence of their employment, and refusing to cooperate with a court-ordered parenting capacity evaluation. On June 10, 2003, the state district court granted each of the petitions and terminated the parental rights of Jack and Kathy Stratton to all their children save one. As explained by the court of appeals in August 2003,

> [o]n 10 June 2003 . . . [defendant Sharpe] entered an order, following several months of hearings, terminating the parental rights of Mr. and Mrs. Stratton. Based on the evidence presented at the hearings, [Judge Sharpe] concluded that the Stratton children were neglected . . . and that [the County DSS] had proven by clear, cogent, and convincing

---

[13] By late 2002, the eldest of the Stratton children was more than eighteen years old and no longer involved in the proceedings.

[14] Defendants Hollingsworth and Adden are the attorney-signatories to the termination petitions. Defendant Fee is a County DSS official who reviewed the terminations of parental rights petitions and verified their accuracy.

evidence that grounds existed to terminate the parental rights of the Strattons.

In re Stratton, 583 S.E.2d 323, 324 (N.C. Ct. App. 2003) ("Stratton II"). On the basis of the terminations, the court of appeals dismissed as moot Jack Stratton's appeal of the state district court's neglect and dependency rulings. See id.[15]

At least two additional orders were thereafter entered by the Supreme Court of North Carolina that are pertinent to the termination of the Strattons' parental rights by the state courts. First, on March 4, 2005, North Carolina's high court reversed the denial by the court of appeals of the Strattons' request for an extension of time to prepare a record on appeal, and it remanded for entry of an order granting the extension. See In re I.S., 612 S.E.2d 128 (N.C. 2005).[16] Second, on May 24, 2005, the Supreme Court of North Carolina entered an order denying Jack Stratton's petition for extraordinary relief, by

---

[15] The Stratton II opinion reflects that Jack Stratton was then represented by defendant Schmidt, and that the court of appeals panel was comprised of defendants Geer, Eagles, and Martin.

[16] The March 4, 2005 Order of the Supreme Court of North Carolina reflects that Jack Stratton was proceeding pro se, defendant Wade represented the County DSS, defendant Lucey represented the guardian ad litem, and defendant Loftis represented the Council for Children. In sum, it appears that the named defendants include the judges who have so far ruled against the Strattons, as well as most of the lawyers who represented parties adverse to them.

17

which he unsuccessfully sought various writs, including mandamus, prohibition, supersedeas, and a stay of judgment. See In re I.S., 615 S.E.2d 293 (N.C. 2005). Since 2005, there have been no judicial proceedings conducted in the state courts of North Carolina with respect to the Strattons and their children. And there were no efforts made by the Strattons to secure relief in the Supreme Court of the United States. The proceedings at bar were not commenced until 2010.[17]

C.

On October 4, 2010, ten days after the Strattons filed the Complaint, the case was assigned to a judge in the District of South Carolina, with the related motions referred to a magistrate judge of that district. Jack and Solomon Stratton thereafter unsuccessfully sought recusal of the magistrate

---

[17] This litigation is not Jack Stratton's first venture into federal court. On October 2, 2002, he filed a federal complaint seeking injunctive relief from an order entered in the child custody proceedings in state district court. That complaint was dismissed on the Rooker-Feldman doctrine. See Stratton v. Miller, 3:02-cv-00420 (W.D.N.C. 2002). Additionally, on December 6, 2002, two weeks after the Supreme Court of North Carolina rejected the Strattons' challenge to the court-ordered immunizations of their children, Jack Stratton filed a pro se complaint in the Western District of North Carolina seeking relief against the immunizations. It was dismissed for failure to prosecute. See Stratton v. Mecklenburg Cnty. Dep't of Soc. Svcs., 3:02-cv-00510 (W.D.N.C. 2002).

18

judge. For reasons of judicial efficiency, however, a second magistrate judge was thereafter assigned to the case.

On August 5, 2011, the magistrate judge filed his report in the matter, recommending dismissal of the Complaint for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and the Rooker-Feldman doctrine, and further recommending that all other pending motions be denied as moot (the "Report").[18] In explaining its recommendation concerning the various Claims in the Complaint, the Report concluded that

> [t]he plaintiffs' allegations of conspiracy, criminal RICO child trafficking, religious and racial genocide, assault, battery, intentional infliction of emotional distress, malice, constitutional violations, and statutory violations are all allegations that could and should have been raised in the state court proceedings, which were concluded over six years prior to the filing of this action.

Report 5.

Jack and Solomon Stratton responded to the Report with timely objections. Their objections, however, did not dispute the merits of the Report's recommendation that the Complaint should be dismissed under Rule 12(b)(1) and the Rooker-Feldman doctrine, but instead asserted that the Report was "a complete fraud," and was "VOID, criminally fraudulent, and generated for

---

[18] The Report is found at J.A. 367-74.

19

the express purpose of obstructing justice." J.A. 278. Their objections to the Report further asserted that

> Jack and Kathy Stratton and their ten children were never parties in any North Carolina juvenile court proceedings and Jack and Kathy Stratton's parental rights were never terminated. Jack and Kathy Stratton's minor children were never placed in foster care. [The magistrate judge's] action constitute[s] an abuse of discretion and judicial conspiracy.

Id. at 381. Jack Stratton, for himself only, then filed various motions in the federal district court seeking, inter alia, the magistrate judge's "Immediate Removal From the Bench," and requesting "Judicial Notice re Void 'Juvenile Proceedings' and 'Appellate Decisions.'" J.A. 14.

The objections to the Report were rejected by Order of September 16, 2011, when the district court adopted the Report and dismissed the Complaint.[19] The other pending motions were

---

[19] The Report and Order relied on, inter alia, the following authorities: Berry v. South Carolina Dep't of Soc. Svcs., 121 F.3d 697 (4th Cir. 1997) (unpublished table decision) (affirming dismissal of parent's complaint challenging actions against him for child abuse); Salvetti v. Georgia Bar Ass'n, 2007 WL 433390, at *1 (M.D.N.C. Feb. 6, 2007) (dismissing complaint challenging "various custody actions throughout the past ten years in the state courts of Georgia" on the basis of, inter alia, the Rooker-Feldman doctrine); Burdick v. Pritchett & Burch, PLLC, 2008 WL 7542377 (E.D.N.C. Nov. 16, 2008) (dismissing, based on the Rooker-Feldman doctrine, complaint alleging that plaintiff's former spouse's lawyers and state court judges had manipulated the legal system); Barbeau v. Gen. Ct. of Justice, 2010 WL 2812695 (E.D.N.C. June 15, 2010) (recommending dismissal, based on the Rooker-Feldman doctrine, of complaint asserting "that parental custody of [plaintiff's] son and his visitation rights were determined by the state courts in a manner that resulted in (Continued)

20

not resolved by the district court, but were rendered moot by the Order's dismissal of the Complaint for lack of subject matter jurisdiction.

Following entry of the Order of September 16, 2011, Jack and Solomon Stratton filed a document purporting to make further objections to the Report. Therein, the plaintiffs asserted that the federal court proceedings were "void," accused the presiding district judge of "crimes of false imprisonment, rape, and sodomy of little children and the disabled," and asserted yet again that "it has already been proven that Jack and Kathy Stratton and their ten children were never parties and [the defendants] never had any jurisdiction over them." J.A. 479, 483. Those objections were not further addressed, and Jack and Solomon Stratton filed a timely pro se notice of appeal from the Order. We have assigned amicus counsel to assist our handling

violations of his federal civil and Constitutional rights"). Because the district court ruled that it lacked subject matter jurisdiction under the Rooker-Feldman doctrine, it did not address the defendants' other alleged grounds for dismissal, which included, inter alia, the substantiality doctrine, insufficient service of process, statutes of limitations, and absolute immunity. For example, the Report relates that five defendants were never served with process, including the DHHS, which was the only defendant in Claim VI.

21

and resolution of the appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.[20]

## II.

We review de novo a district court's dismissal of a complaint for lack of subject matter jurisdiction pursuant to the <u>Rooker-Feldman</u> doctrine. <u>See</u> <u>Burrell v. Virginia</u>, 395 F.3d 508, 511 (4th Cir. 2005). Our evaluation of an appeal is not limited to the grounds relied upon by the district court, however, and we are entitled to affirm on any basis apparent from the record. <u>See</u> <u>United States v. Smith</u>, 395 F.3d 516, 519 (4th Cir. 2005). Although we accept the well-pleaded factual allegations of a complaint as true, and we draw reasonable inferences therefrom in the plaintiff's favor, we do not blindly accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," nor do we accept "allegations that contradict matters properly subject to judicial notice." <u>Veney v. Wyche</u>, 293 F.3d 726, 730 (4th Cir. 2002). And although we are obliged to construe liberally the allegations of a pro se complaint, we are not required to credit outlandish conspiracy theories simply because a plaintiff does

---

[20] Plaintiff Jack Stratton died during the pendency of this appeal. There has been no motion for substitution, and he is therefore no longer a party. <u>See</u> Fed. R. App. P. 43(a)(1).

22

not have a lawyer.  See Weller v. Dep't of Soc. Svcs., 901 F.2d 387, 390-91 (4th Cir. 1990).

III.

A.

As explained further below, we are satisfied to affirm the district court's dismissal of the Complaint in this case.  In doing so, we employ jurisdictional doctrines that are rarely relied upon in the federal courts, that is, the Rooker-Feldman doctrine and the substantiality doctrine.

1.

The Rooker-Feldman doctrine, which prohibits the lower federal courts from reviewing or rejecting state court judgments, serves as a jurisdictional bar to federal court review of each of the federal claims alleged in the Complaint. We agree with the federal district court and the Report in that respect.  The doctrine takes its name from two decisions of the Supreme Court — Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).  Simply stated, those precedents bar the federal courts from exercising jurisdiction in "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of

23

those judgments." Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 284 (2005). More recently, the Supreme Court reaffirmed the propriety of applying the Rooker-Feldman doctrine to a situation where "[t]he losing party in state court filed suit in a U.S. District Court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking federal-court review and rejection of that judgment." Skinner v. Switzer, 131 S. Ct. 1289, 1297 (2011).[21]

Except in limited circumstances not applicable here, the only federal court with the authority to reverse or modify the judgments of state courts is the Supreme Court itself. Exxon Mobil, 544 U.S. at 283 (citing 28 U.S.C. § 1257). In this appeal, the submissions of the amicus counsel agree that the Rooker-Feldman doctrine is largely applicable to the various claims. He argues, however, that the pro se allegations of the Complaint also allege an independent Fourteenth Amendment due process challenge, under 42 U.S.C. § 1983, to the procedures used by Mecklenburg County and the state courts of North

---

[21] In Skinner, the Supreme Court concluded that the Rooker-Feldman doctrine would not, in the proper circumstances, bar a plaintiff from asserting a claim under § 1983, cautioning that when "a federal plaintiff presents an independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court." Skinner, 131 S. Ct. at 1297 (internal quotation marks omitted).

24

Carolina for removing the Stratton children from the family home and terminating the Strattons' parental rights. To the extent that any such due process claim may be derived from Claim I, however, it fails to pass muster for a sound legal reason also asserted on appeal by the defendants — the substantiality doctrine.

2.

As explained by the Supreme Court, the substantiality doctrine forbids the federal district courts from exercising subject matter jurisdiction over claims that are attenuated and insubstantial, absolutely devoid of merit, obviously frivolous, or no longer open to discussion. See Hagans v. Lavine, 415 U.S. 528, 536-37 (1974). The substantiality doctrine has also been equated by the Court with a federal court's dismissal of claims that are "essentially fictitious." Id. at 537.

As we have heretofore explained, application of the substantiality doctrine "is especially important where a wholly frivolous federal claim serves as a pretext to allow a state-law issue, the real focus of the claim, to be litigated in the federal system." Lovern v. Edwards, 190 F.3d 648, 655 (4th Cir. 1999). And, when faced with clearly fictitious factual claims, other federal courts have dismissed them under the substantiality doctrine. See, e.g., Newby v. Obama, 681 F. Supp. 2d 53, 56 (D.D.C. 2010) (dismissing "bizarre conspiracy

25

theory" related to "alleged government surveillance and harassment," based on substantiality doctrine); Richards v. Duke Univ., 480 F. Supp. 2d 222, 232 (D.D.C. 2007) ("Claims that are essentially fictitious . . . such as those that allege bizarre conspiracy theories . . . warrant a dismissal under [the substantiality doctrine].") (internal quotation marks omitted); O'Brien v. U.S. Dep't of Justice, 927 F. Supp. 382, 385 (D. Ariz. 1995) ("On their face, Plaintiff's allegations are so bizarre and delusional that they are wholly insubstantial and cannot invoke this Court's jurisdiction.")

B.

As the lower court properly determined in its Order disposing of the case, the "plaintiffs' allegations against the defendants — to the extent they can be deciphered — relate directly to and are inextricably intertwined with the North Carolina courts' judicial termination of Jack and Kathy Stratton's parental rights." See Report 7. In their federal court filings, Jack and Solomon Stratton were unrelenting in their demand that the court take "judicial notice" of facts and law that contradicted the state courts' custodial orders. See, e.g., J.A. 177 (requesting judicial notice that "the underlying alleged Mecklenburg County Juvenile Court Orders are void ab initio and legal nullities," and that the Strattons' "parental rights have never been terminated according to law and their

26

minor children continue to be held illegally" (emphasis omitted)). Indeed, the plaintiffs recognize in the Complaint that the actions taken by the County DSS were directly authorized and, in some cases, ordered, by the state courts of North Carolina.[22]

As the amicus counsel acknowledges, to the extent Solomon Stratton seeks to vacate and enjoin the state court judgments relating to the juvenile proceedings, the termination of the Strattons' parental rights, and the custody issues respecting their children, those claims have been irrevocably resolved by the North Carolina courts and are barred by the Rooker-Feldman doctrine.[23] See Br. of Amicus Curiae 22 n.2 (conceding applicability of Rooker-Feldman doctrine insofar as Complaint seeks "to vacate and enjoin" state court judgments). Nevertheless, the amicus counsel has, to his credit, mined the

---

[22] Insofar as Solomon Stratton disputes the legal consequences of the various state court proceedings — for example, the termination of the parental rights of his parents — the records of those proceedings constitute pertinent facts in this litigation, properly subject to judicial notice. See Veney v. Wyche, 293 F.3d 726, 731 (4th Cir. 2002); see also Fed. R. Evid. 201.

[23] As part of its Claim III, the Complaint reflects some familiarity by the plaintiffs with the Rooker-Feldman doctrine, alleging that "[d]efendants conspire, pre-plan, and execute . . . the fraudulent use of legal doctrines such as 'Rooker-Feldman' . . . to protect and conceal the enterprise from being exposed in the federal courts." Complaint ¶ 452 (emphasis omitted).

27

Complaint and sought to identify and marshal allegations which, taken together, permit a good faith assertion that Claim I raises a § 1983 due process challenge to the adequacy of North Carolina's procedures for removing the Stratton children from their parents' custody, as well as the state's procedures for the termination of the Strattons' parental rights.

For example, the amicus emphasizes the Complaint's allegation that "the post-deprivation hearings required by [North Carolina law] do not exist in Mecklenburg County. They have been eliminated through the extrinsic fraud scheme set forth [in the Complaint]." Complaint ¶ 161. The amicus also argues that, as part of the conspiracy described in the Complaint, the paperwork utilized by the County DSS and the state courts deceives parents into waiving their due process protections, and "[t]he Stratton parents and children have been denied all pre-deprivation and post-deprivation due process." Id. ¶¶ 171-75, 301. Thus, even the amicus counsel is constrained to rely on the bizarre conspiracy allegations to seek a viable contention. Even if the due process claim proposed by the amicus counsel is acknowledged, however, it is necessarily circumscribed by the Rooker-Feldman doctrine. And any such claim utterly fails to pass muster under the substantiality doctrine.

28

C.

The liberal construction which we are obliged to afford to a pro se complaint is not without bounds. Admittedly, pro se complaints "represent the work of an untutored hand requiring special judicial solicitude." Nevertheless, they "may present obscure or extravagant claims defying the most concerted efforts to unravel them." Beaudett v. City of Hampton, 775 F.2d 1274, 1277 (4th Cir. 1985). As we have acknowledged, "[d]istrict judges are not mind readers," and the principle of liberal construction does not require them to "conjure up questions never presented to them . . . [or to] construct full-blown claims from sentence fragments." Id. at 1278.

For multiple reasons, each of the plaintiffs' claims, including the amicus counsel's asserted due process claim, is frivolous, wholly without merit, and thus insubstantial. Those reasons include the following: First, not having been properly pursued in the district court, any due process claim propounded by the amicus counsel has been waived. We would review such a claim for plain error only. Second, it is clear that the primary focus of the Complaint is to seek the summary invalidation of the state court orders that underlie the termination of the Strattons' parental rights. Third, it is apparent that the Strattons were represented by counsel throughout the state court proceedings, and that their

29

constitutional rights were protected. Fourth, any claim against the judicial defendants would certainly be subject to dismissal based on the doctrine of absolute judicial immunity. See Bradley v. Fisher, 80 U.S. 335 (1871) (explaining that "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself"); see also Dean v. Shirer, 547 F.2d 227 (4th Cir. 1976) (affirming dismissal of § 1983 claim on basis of judicial immunity).[24] Fifth, the due process allegations relied upon by the amicus counsel must be viewed in context, that is, they are scattered within a bizarre sixty-page Complaint that features a fictitious centuries-old international child trafficking conspiracy. And finally, it is clear that any due process claim is a mere pretext for the real focus of the Complaint, which challenges the validity of records and proceedings of the North Carolina courts that resulted in the termination of the Strattons' parental rights. As the district court explained, those claims were resolved in the North Carolina courts and are barred by the Rooker-Feldman doctrine.

---

[24] Each of the eight judicial defendants asserted absolute judicial immunity.

30

In these circumstances, we agree with the defendants that all of the plaintiffs' claims are "so attenuated and unsubstantial as to be absolutely devoid of merit." Hagans, 415 U.S. at 536. And we readily conclude that the due process argument asserted by amicus counsel is "a pretextual federal issue [asserted] solely for the purpose of having [] state-law claim[s] [i.e., parental rights issues] adjudicated in the federal system." Lovern, 190 F.3d at 655. As we explained years ago, "Article III of the Constitution forbids this practice." Id.[25]

IV.

Pursuant to the foregoing, the Complaint is barred by the Rooker-Feldman doctrine, and the due process claim argued by the amicus counsel fails to pass muster under Rooker-Feldman and the

---

[25] The two purported state law claims of the Complaint — assault and battery (Claim VII) and legal malpractice (Claim VIII) — must also be dismissed. The sole basis for federal jurisdiction over them would be the supplemental jurisdiction statute, codified at 28 U.S.C. § 1367. Section 1367 only extends the jurisdiction of a district court to claims which do not themselves fall within any independent basis for federal jurisdiction, but which are closely related to another claim over which the court possesses original jurisdiction. When a district court dismisses federal claims for lack of subject matter jurisdiction, there was never a valid claim to which the state claims could be considered supplemental, and dismissal of the state claims is also required. Crosby v. City of Gastonia, 635 F.3d 634, 644 (4th Cir. 2011).

31

substantiality doctrine.  Because the federal district court lacked subject matter jurisdiction over the alleged federal claims, its dismissal of those claims pursuant to Rule 12(b)(1) was proper, and its concurrent dismissal of the state law claims was mandated.  We therefore affirm the judgment of the district court.

AFFIRMED

GREGORY, Circuit Judge, concurring:

I agree with the majority's decision to affirm the district court's dismissal of Stratton's complaint. I concur with the rationale with one exception--I would find that the due process claim is substantial and not barred by the Rooker-Feldman doctrine, but fails to state a claim upon which relief could be granted. I would thus affirm the dismissal of the due process claim on that ground. See Greenhouse v. MCG Capital Corp., 392 F.3d 650, 660 (4th Cir. 2004).

I.

Admittedly, in the complaint, Solomon Stratton claims that he and his family are victims of an international Luciferian child trafficking conspiracy whose reach plausibly extends from the United Nations to child protection authorities in Mecklenburg County. Beyond these incredulous allegations however, Solomon Stratton asserts that he was deprived due process of law in the initial seizure of the Stratton children and in the termination of the Stratton parents' rights.

The majority recognizes that "Claim I raises a § 1983 due process challenge to the adequacy of North Carolina's procedures for removing the Stratton children from their parents' custody, as well as the state's procedures for the termination of the Strattons' parental rights." Ante, at 28. Yet, it concludes

33

that the due process claim articulated in the complaint is so attenuated that it is insubstantial, and is merely a pretext for having a state-law claim adjudicated in federal court thus barred by the Rooker-Feldman doctrine. I am of a different view.

II.

A.

First, I would find that the due process claim is substantial and thus jurisdiction exists to hear the merits. The substantiality doctrine states that "federal courts are without power to entertain claims otherwise within their jurisdiction if they are 'so attenuated and insubstantial as to be absolutely devoid of merit, wholly insubstantial, obviously frivolous, plainly insubstantial, or no longer open to discussion.'" Davis v. Pak, 856 F.2d 648, 650-51 (4th Cir. 1988) (quoting Hagans v. Lavine, 415 U.S. 528, 536-37 (1974)).

The "insubstantiality threshold is a difficult one to meet," as "dismissal for insubstantiality is appropriate only where the proffered claim is truly frivolous," or is merely a "pretext[] for the purpose of having a state law claim adjudicated in the federal system." Davis, 856 F.2d at 651 (emphasis added). Thus, a dismissal for insubstantiality is "appropriate in only the rarest of circumstances where . . . the

34

complaint is deemed totally implausible." Apple v. Glenn, 183 F.3d 477, 480 (6th Cir. 1999); see Ricketts v. Midwest Nat. Bank, 874 F.2d 1177, 1182 (7th Cir. 1989) ("insubstantiality dismissals should be applied only in extraordinary circumstances").

If the "complaint raises an arguable question of law which the court may ultimately resolve against the plaintiff," the more appropriate mechanism for dismissal is Federal Rule of Civil Procedure 12(b)(6). Ricketts, 874 F.2d at 1182 n.6; see Neitzke v. Williams, 490 U.S. 319, 326 & n.6 (1989) (holding that Rule 12(b)(1) insubstantiality dismissal is appropriate if based on the judge's disbelief of a complaint's factual allegations, whereas, a Rule 12(b)(6) dismissal is appropriate where while operating under the assumption that all or a set of facts in the complaint are true, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one," it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations).

Applying these principles, it seems to me that we could disregard the bizarre conspiracy alleged by Solomon Stratton and consider whether his due process claim fails to state a claim. The due process claim asserted here is not dependent on the Luciferian conspiracy; whether the Strattons were denied due

35

process of law in the initial seizure of the children and in the permanent termination of parental rights is a sufficiently substantial legal question that has not been addressed by any court in the 12 years since this matter arose. Given the liberal construction due to pro se litigants, and our duty to apply the substantiality doctrine only in rare or extraordinary circumstances, the more appropriate approach would be to proceed to analyze whether the claim passes muster under Rule 12(b)(6). Before turning to that question, I first address the separate question whether the Rooker-Feldman doctrine bars the claim.

B.

The majority concludes that to the extent the due process claim is acknowledged, it is "necessarily circumscribed" by Rooker-Feldman. Ante, at 28. I disagree. The Rooker-Feldman doctrine essentially holds that lower federal courts lack authority to "sit in direct review of state court decisions." Feldman, 460 U.S. at 482 n. 16 (citation omitted). This doctrine applies specifically to cases where "the loser in state court files suit in federal district court seeking redress for an injury allegedly caused by the state court's decision itself." Davani, 434 F.3d at 713. Thus, in applying the doctrine, (1) there must be a prior state court decision; and (2) the loser in the state court must be challenging or seeking to undo the prior state court's decision by alleging an injury

36

caused by the state court judgment itself. The doctrine has narrow applicability, and should not be confused or conflated with preclusion doctrines. Exxon Mobile Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

The Third Circuit recently considered whether a due process claim based on custodial termination proceedings was barred by the Rooker-Feldman doctrine. In B.S. v. Somerset County, the plaintiff "challenge[d] the process she received with respect to state court orders." 704 F.3d 250, 259 (3d Cir. 2013). The state court orders terminated the mother's custodial rights, transferring them to the father, and denied the mother's habeas petition in which she argued the county violated state law by removing her daughter from her custody without a hearing. The Third Circuit held that because "the injury Mother claims is . . . traceable to the [a]ppellee's actions, as opposed to the state court orders those actions allegedly caused, . . . the Rooker-Feldman doctrine [does not] preclude[] federal subject matter jurisdiction." Id. at 260.

Here, the due process claim asserts, as amicus counsel frames it, "an unjustified seizure of [Solomon] and his siblings by Mecklenburg County," "an improper exercise of jurisdiction over [Solomon] and his family," and a lack of "fundamental due process in the County's termination procedures." (Amicus Counsel's Br. 10, 23.) These allegations are independent of,

37

and do not seek to overturn, any prior state-court judgment.[1] Stratton's relief does not depend on whether the prior state court judgments are overturned or vacated. Even if the order terminating parental rights was valid, the actions taken by the County to seize and retain custody over the children may have been improper. Because Stratton alleges an independent constitutional tort claim which is not dependent on the validity of the orders terminating parental rights, the Rooker-Feldman doctrine does not bar the due process claim asserted here.

## C.

Because I believe the due process claim survives both the insubstantiality bar and the Rooker-Feldman bar, I next consider whether the due process claim fails to state a claim. Stripping away the incredulous conspiracy theory, succinctly stated, Stratton asserts that the removal of the children and termination of parental rights deprived them of their right to live together as a family without due process of law, in violation of the Fourteenth Amendment.

The Due Process Clause of the Fourteenth Amendment prohibits States from depriving "any person of life, liberty, or

---

[1] As the majority notes, amicus counsel properly concedes that to the extent that the prayer for relief asks the court "to vacate and enjoin" various state-court judgments, (see J.A. 158), the request is barred by the Rooker-Feldman doctrine.

38

property, without due process of law." U.S. Const. amend. XIV. Due Process consists of both substantive and procedural due process components, both of which are asserted here. Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach, 420 F.3d 322, 328 (4th Cir. 2005). To state a due process claim, either substantive or procedural, a plaintiff must allege: (1) that they have been deprived of "interests encompassed by the Fourteenth Amendment's protection of liberty and property," Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972); and (2) the deprivation did not comport with process that is constitutionally due, Morrissey v. Brewer, 408 U.S. 471, 484 (1972). For a substantive due process claim, a plaintiff must also show that the state's action is so arbitrary and egregious that it "shocks the conscience."[2] Cnty of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

The Supreme Court has recognized a "fundamental liberty interest of natural parents in the care, custody, and management of their child." Santosky v. Kramer, 455 U.S. 745, 753 (1982). As such, there is no doubt that now-deceased Jack Stratton had a

---

[2] The Ninth Circuit has held that the proper test for the deprivation of familial companionship in violation of substantive due process is whether the state action amounts to "unwarranted interference" as opposed to whether it "shocks the conscience." Crowe v. Cnty. of San Diego, 608 F.3d 406, 441 & n.23 (9th Cir. 2010) (citations omitted).

39

liberty interest in retaining custody over, caring for, and rearing his children as he deemed appropriate. See Jordan by Jordan v. Jackson, 15 F.3d 333, 342 (4th Cir. 1994) ("The state's removal of a child from his parents indisputably constitutes an interference with a liberty interest of the parents and thus triggers the procedural protections of the Fourteenth Amendment."). However, because Jack is no longer a party to this action, the issue is whether Solomon, Jack's son and the remaining Appellant, has a reciprocal liberty interest in being supervised and cared for by his parents.

Whether children "have cognizable, reciprocal interests in the companionship and supervision of their parents, and in maintaining the emotional bonds that develop within the unitary family" is an open question in this Circuit and has not been decided by the Supreme Court.[3] Jordan, 15 F.3d at 343 n.10 (citing Michael H. v. Gerald D., 491 U.S. 110, 130 (1989) (plurality) ("We have never had occasion to decide whether a child has a liberty interest, symmetrical with that of her parent, in maintaining her filial relationship."); Smith v. Org.

---

[3] In Santosky, the Supreme Court recognized that "the child and his parents share a vital interest in preventing erroneous termination of their natural relationship," 455 U.S. at 760, yet the Court has never held that this interest amounts to a Fourteenth Amendment liberty interest.

of Foster Families, 431 U.S. 816, 847 (1977)).[4]  For purposes of analysis, I assume that children have reciprocal liberty interests in retaining nurturing relationships with their parents.  See Michael H., 491 U.S. at 130 (assuming for the purpose of analysis that a child has a liberty interest in maintaining her filial relationship).  Based on this assumption, Solomon has liberty interest in the supervision of his parents and may assert a due process claim, even in Jack's absence.  A review of the complaint indicates that Solomon has sufficiently pled the existence and deprivation of a liberty interest, satisfying the first prong to state a due process claim.

As to the second prong, Solomon must allege that the deprivation did not comport with constitutionally due process.  Here, his claim fails.

---

[4]  The Second and Ninth Circuits have held that children possess such liberty interests.  See Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987) overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999) (en banc) ("The companionship and nurturing interests of parent and child in maintaining a tight familial bond are reciprocal, and we see no reason to accord less constitutional value to the child-parent relationship than we accord to the parent-child relationship."); Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir. 1977) ("[W]e are concerned with the most essential and basic aspect of familial privacy[--]the right of the family to remain together without the coercive interference of the awesome power of the state.  This right to the preservation of family integrity encompasses the reciprocal rights of both parent and children.").

It is true that regardless of the state's practices and procedures, "[w]hat process is due" is a question of constitutional law, not state law. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985). When a state seeks to deprive a child of the liberty interest in being nurtured by their parent, it must provide procedures that are fundamentally fair. See Santosky, 455 U.S. at 753-54 (holding that "[w]hen the State moves to destroy . . . familial bonds, it must provide parents with fundamentally fair procedures.").

Yet, the complaint fails to satisfy the second element because it is clear that the state court provided Stratton with notice and adequate hearings prior to the termination of the familial relations. The complaint alleges numerous procedural defects, none of which persuade otherwise, and only one is worth addressing. Specific to the initial seizure of the children, the complaint alleges that the Strattons: (1) never received certain state-mandated summons or at the very least, the required 7-day initial hearing, see N.C. Gen. Stat. Ann. § 7B-506(a); and (2) were never given the opportunity to present evidence to determine whether to continue custody, see id. § 7B-506(b). These assertions bely the court records which are the proper subject of judicial notice. See Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (holding that in considering whether a claim fails to state a claim, we need not "'accept as true

42

allegations that contradict matters properly subject to judicial notice or by exhibit.'" (quoting <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001)).

On January 30, 2001, when the Stratton children were removed from their parents' home, the Strattons received summons to appear on February 2, 2001, for the appointment of counsel and other matters relating to the removal of the children. On February 2, the said hearing occurred to determine whether to continue custody of the Stratton children. The Stratton parents attended. No evidence was adduced; however, the court adopted the facts in the petition submitted by MCDSS to obtain the nonsecure custody warrant, which were the same facts as observed by MCDSS on their first visit to the Strattons' first residence on December 19, 2000. The matter was then set for an adjudicatory hearing on March 12, 2001.

Prior to the March 12 hearing, on February 16, the Stratton parents and MCDSS entered into a plan that should have led to reunification of the parents and the children. In the agreement, the parties adopted the same facts as observed by MCDSS on their first visit. The Stratton parents signed the agreement. On March 12, at the adjudicatory hearing, the only evidence presented consisted of the court reading the facts in the mediation agreement into the record. At that hearing, the Stratton parents affirmed those facts.

Their affirmation of the facts is where this case fails, as it cannot be said that they were denied an opportunity to present evidence where they did not take advantage of the opportunity given to them to do so. Moreover, it appears that at some later proceedings, though Jack and Kathy may not have testified themselves, they adduced testimony in the form of affidavits of other witnesses, which favored the Stratton parents' positions. It is clear from this record that the Strattons were given notice and an opportunity to be heard. Therefore, the complaint fails to state a procedural due process violation.

As to the substantive due process claim, the complaint asserts numerous bizarre allegations but fails to state any plausible facts that meet the "shock the conscience" standard. As such, the complaint fails to state a substantive due process violation.

## III.

For the foregoing reasons, I would affirm the district court's dismissal of the complaint.